408 Pa. Superior Ct. 22 (1991)
596 A.2d 172
COMMONWEALTH of Pennsylvania
v.
Warren PETERSON, Appellant.
Superior Court of Pennsylvania.
Argued March 7, 1991.
Filed August 19, 1991.
*23 Karl Baker, Asst. Public Defender, Philadelphia, for appellant.
John K. McDonald, Asst. Dist. Atty., Philadelphia, for the Com., appellee.
Before BECK, POPOVICH and HOFFMAN, JJ.
*24 BECK, Judge:
The issue in this appeal is whether under the fourth amendment a defendant has a reasonable expectation of privacy in an uninhabitable structure which appellant was using to engage in the sale of narcotics. We conclude that appellant had no constitutionally-protected expectations of privacy in the premises searched and as such the police entry did not infringe on fourth amendment rights. Alternatively, we find that exigent circumstances existed which compelled the police to effect a warrantless entry. Therefore, the trial court correctly denied the appellant's motion to suppress. We affirm the judgment of sentence.
The facts underlying the instant appeal are as follows. On the evening of December 14, 1987, Officer Steven Powell, acting on an anonymous tip, went to 2001 West Turner Street in Philadelphia. Powell had been informed that crack and powdered cocaine were being sold through a hole in the door at this location. When the police officer arrived he observed a heavily secured structure which previously had been a storefront but clearly was no longer being used for such purposes. The front windows of the structure were covered with heavy metal gratings and there was a three inch hole in the wooden front door where a doorknob might normally be located. Based on his experience, coupled with the information from the anonymous tip, the officer concluded that the structure was the site of a narcotics selling operation known as a "gate house." A gate house is characterized by the following features: a heavily fortified location; a juvenile or young person manning the sales from inside; quick turnover and sales; and no personal or visual contact between buyer and seller (i.e., the money goes into the hole in the door and the drugs come out).
Satisfied that he had identified the location which was the subject of the tip, Officer Powell knocked on the door. A voice from inside asked, "What do you want?" Powell answered that he wanted "one dime," meaning an amount of cocaine he could purchase for ten dollars. Powell put a *25 ten-dollar bill through the hole in the door and received the drugs. The bill had been pre-recorded and treated with a perspiration reactive powder which stained whoever handled it with an indelible bright blue dye. The dye allows police later to identify the person who had handled the money despite the lack of visual identification. Realizing that the blue dye becomes dramatically visible almost immediately, Powell and his fellow officers attempted to enter the structure to arrest the drug seller. The police knocked on the door and identified themselves. The officers heard "thumping and rustling" noises coming from within the structure but received no answer. The door was secured by heavy bolts and was braced from the inside by several large pieces of wood. The only way the police could open it was by finding a weak point and literally breaking the door in half. When the police entered they found "an unoccupied or abandoned type of property," which appeared to be "an old storefront" but which, as the officer testified, contained "no inventory in there, or anything else that would make it a store." On a sofa just inside the door was a bag containing packets and vials of cocaine in powdered and crack form. In a back room adjacent to the storefront, the police found appellant. He had blue dye all over his hands and on his pants pocket. The ten dollar bill used by Powell to buy the cocaine was in the pocket. Appellant had been in bed with a woman who likewise had blue dye on her body.
The officer described the area in which he found appellant as "disgusting." There were no toilet facilities and there was a five-gallon bucket containing human waste. The officer was reluctant even to describe the place appellant was found as a "bed" since it was makeshift at best. There was no indication that appellant or anyone was occupying the storefront for any purpose other than to disguise and conduct illegal drug activity. In fact, the record indicates that the premises were wholly unsuitable for habitation and were not being used as any kind of residence.[1] When *26 appellant was asked for his address following arrest, he gave it as 1303 S. Dorrance Street in Philadelphia, and not the building in which he was found.
Appellant sought to suppress the evidence seized following the officers' warrantless entry into the structure. Following a hearing, Judge Jane C. Greenspan found that "the abandoned storefront was not arguably a home in the sense intended to be protected by the Fourth Amendment. Having no indicia of a home, it can fairly be said that defendant (not even a resident) had no reasonable or legitimate expectation of privacy in the premises." Judge Greenspan further found that exigent circumstances justified the warrantless entry. We agree with the conclusions of the trial court.
The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Our courts consistently have held that the application of the fourth amendment depends upon whether the person invoking its protection has a "justifiable," "legitimate" expectation of privacy that has been invaded by government action. See, e.g., Commonwealth v. Oglialoro, 525 Pa. 250, 256, 579 A.2d 1288, 1291 (1990)("The controlling consideration is whether the individual contesting the search and seizure entertains a legitimate expectation of privacy in the premises or area searched."); see also Commonwealth v. Brundidge, 404 Pa.Super. 106, 113, 590 A.2d 302, 305-306 (1991); Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); Rakas v. Illinois, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The individual's actual or subjective expectation of privacy alone does not control whether constitutional protection will be extended. See, e.g., Hudson v. Palmer, 468 U.S. 517, 525-526 n. 7, 104 S.Ct. 3194, 3199 n. 7, 82 L.Ed.2d 393 (1984); Commonwealth *27 v. Copenhefer, 526 Pa. 555, 561, 587 A.2d 1353, 1356 (1991). As Mr. Justice Powell noted in his concurring opinion in Rakas, "it is not enough that an individual desired or anticipated that he would be free from governmental intrusion." Rakas v. Illinois, 439 U.S. at 151-152, 99 S.Ct. at 434-35 (Powell, J., concurring). The test of legitimacy is not, and could not be, whether the individual hopes to conceal his activity. See Commonwealth v. Copenhefer, 526 Pa. at 561, 587 A.2d at 1356 ("A defendant's attempt to secrete evidence of a crime is not synonymous with a legally cognizable expectation of privacy."); see also Oliver v. United States, 466 U.S. 170, 182-183, 104 S.Ct. 1735, 1743, 80 L.Ed.2d 214 (1984). In order to claim fourth amendment protection, an individual's expectation of privacy must be one that society is prepared to recognize as reasonable. See Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (Harlan, J., concurring). The resolution of this issue depends upon the totality of the circumstances and ultimately rests upon a balancing of the societal interests involved. Hudson v. Palmer, 468 U.S. at 527, 104 S.Ct. at 3200; Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980).
In support of his argument that he had a "reasonable expectation of privacy" in the area searched, appellant points to several factors all of which, in our view, establish nothing more than appellant's subjective interest in concealing and keeping "private" his own conduct. Specifically, appellant notes that the use of a heavily fortified door and the fact that he chose to engage in intimate, sexual activity on the premises illustrate his expectation that "this area would remain private." This approach is untenable and has been uniformly rejected by our courts. As Mr. Justice Rehnquist (now Chief Justice) stated in Rakas v. Illinois:
Obviously ... a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered. A burglar plying his trade in a summer cabin during the off season may have a thoroughly *28 justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence, in the words of Jones [citation omitted] is "wrongful;" his expectation is not "one that society is prepared to recognize as `reasonable.'"
Id. 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12 [citations omitted].
Likewise, the United States Supreme Court, in Oliver v. United States, supra, concluded that legitimate expectations of privacy could not be created simply by building fences and posting "no trespassing" signs around secluded land used to cultivate marijuana. The Court noted: "Certainly the Framers did not intend that the Fourth Amendment should shelter criminal activity wherever persons with criminal intent choose to erect barriers and post `No Trespassing' signs." 466 U.S. at 182 n. 13, 104 S.Ct. at 1743 n. 13.
The fortification of the door in the instant case no more legitimized appellant's expectations of privacy than did the erecting of fences and posting of signs in the Oliver case. We are persuaded that appellant actually desired that his activities within the gate house remain private and free from government intrusion. However, in our view it would trivialize the fourth amendment to base its protection on the number and strength of the barricades an individual erects to shield his activities from official detection. The "legitimacy" element of the inquiry must have more content than appellant suggests.[2]
*29 Of course, it is now beyond dispute that fourth amendment protection is not limited to private homes or "other specifically designated locales." United States v. Chadwick, 433 U.S. 1, 7, 97 S.Ct. 2476, 2481, 53 L.Ed.2d 538 (1977). Relying on the oft-repeated but over simplified principle that the fourth amendment "protects people, not places",[3] the Supreme Court frequently has repudiated the notion that the scope of the constitutional protection can be defined solely by the kind of property involved in the search. On the other hand, "people" are not protected wherever or whenever they assert any privacy interest. People can claim fourth amendment protection only insofar as they can assert a reasonable and legitimate expectation of privacy in a particular physical space.[4]
*30 Several factors are relevant in assessing whether an individual legitimately may claim the protection of the fourth amendment. Courts will look to the intended reach of the fourth amendment, the nature of the structure or area searched and the uses to which the structure or area is put, and societal judgments and understandings regarding the privacy rights asserted. In order to assess the legitimacy of an asserted expectation of privacy we seek to uncover "our societal understanding" of which areas and what conduct should be accorded this "scrupulous protection." Oliver v. United States, supra, 466 U.S. at 178, 104 S.Ct. at 1741 (emphasis in original).
Foremost, of course, among the areas for which "scrupulous protection" is provided against government intrusion by the fourth amendment is an individual's home.[5] Traditional and inviolate expectations of privacy in one's home are the bedrock of constitutional protection against arbitrary government intrusion.[6] This protection does not stem from notions of common law property interests in the premises. Nor does the protection surrounding the home depend upon whether the dwelling comports with conventional notions of the definition of a home or how a home is constructed. Further, the word "houses" has never been taken literally by our courts. Fourth amendment protection is not grudgingly extended only to those premises which can be characterized as the permanent living quarters of *31 the occupants who claim constitutional shelter therein. Therefore, legitimate expectations of privacy are found in hotel rooms during a period of paid occupancy.[7]Commonwealth v. Cooper, 240 Pa.Super. 477, 488, 362 A.2d 1041, 1049, vacated on other grounds, 468 Pa. 390, 363 A.2d 783 (1976), cert. denied, 429 U.S. 1048, 97 S.Ct. 758, 50 L.Ed.2d 763 (1977). Likewise, fourth amendment protection extends to offices and commercial premises.[8]
Finally, the Supreme Court recently held that an overnight houseguest can claim a legitimate expectation of privacy in his host's home. Minnesota v. Olson, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).[9] In so holding, the Supreme Court "merely recognize[d] the everyday expectations of privacy that we all share." Id. at ___, 110 S.Ct. at 1689, 109 L.Ed.2d at 94. The Court reasoned:
Staying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society. We stay in each others' homes when we travel to a strange city for business or pleasure, when we visit our parents, children, or more distant relatives out of town, when we are in between jobs or homes, or when we house-sit for a friend. We will all be hosts and we will all be guests many times in our lives. From either perspective, we think that society recognizes that a houseguest has a legitimate expectation of privacy in his host's home.
Id.
Implicit in the above discussion is a common, deep and basic understanding that our society accords to its citizens *32 the right to be secure in areas and activities ordinarily associated with autonomy, privacy and lifestyle. Society assumes that certain areas and certain activities must be safeguarded because our traditions and common experience teach us that without that protection our freedom and security would be intolerably undermined. Society is willing, indeed anxious, to legitimize expectations of privacy because we all share the fundamental understanding that safe and inviolate zones of privacy are necessary to live our lives and conduct our business.[10]
Against the backdrop of these principles, we assess appellant's claim to a legitimate expectation of privacy in 2001 West Turner Street. Appellant blandly asserts that there was a couch in one room and a bed in another and that a "home has the highest expectation of privacy." We consider appellant's cynical claim for constitutional protection of his "home" wholly unsupportable.[11] As our previous discussion makes plain, it is not the superficial characteristics of a structure, its walls, windows, doors or even furnishings, which give it the constitutional cloak accorded a home.[12] Rather, it is the habitation of the structure and its *33 use as a residence which form the purpose of the constitutional protection. Appellant's reliance on the existence of a random piece of furniture or a heavily barricaded door misses the point. Noone inhabited the area into which the police entered. In fact, the evidence at the hearing established that it was uninhabitable as a dwelling and was wholly unsuited to domestic use.[13] The record supports the conclusion that the structure was a vacant storefront with no indicia of home life whatsoever. We think that it is of no consequence that appellant and his female friend chose to engage in sexual activity in an adjacent room. A sexual encounter does not transform this structure into an area in which appellant could have had a legitimate expectation of privacy.
Moreover, appellant's only relationship to the structure in question was as a temporary drug dispersal depot. The facts developed at the hearing demonstrated that the storefront was a typical "gate house" operation which is constructed solely for rapid and highly protected drug distribution. The structure clearly was an abandoned building, *34 previously owned and operated as a store.[14] From the record we can conclude that 2001 West Turner was an example of urban wreckage which appellant and his cohorts conveniently transformed into temporary headquarters for their drug trade. The premises were outfitted with nothing more than was necessary to conduct the narcotics sales and avoid official detection. Appellant claimed no other relationship to the structure nor did the record suggest one.[15] Appellant was not legitimately on the premises. Nothing in the record could support the inference that appellant had any right to enter or use the building. Under these circumstances, we conclude that society would not be prepared to recognize appellant's expectation of privacy as a legitimate one.[16]
This court reached the same conclusion in a similar case, Commonwealth v. Cameron, 385 Pa.Super. 492, 561 A.2d 783 (1989), appeal denied, 525 Pa. 576, 575 A.2d 108 (1990). In Cameron, the defendant was arrested for selling narcotics *35 inside a building with characteristics resembling the one in the instant case. The building in Cameron was littered with trash, windows were boarded up or broken, there were no bathroom facilities and no running water or electricity. When the defendant in Cameron was arrested, he gave another address as his residence. The suppression court granted Cameron's motion to suppress the seized narcotics, reasoning that the presence of food, a couch, and a television set gave the building some attributes of a dwelling. This court reversed. We found that the record revealed that Cameron had no "legal or de facto right to control the house." Cameron, 385 Pa.Super. at 498, 561 A.2d at 786. We found that the house was "not a home, but a mere structure" which was both abandoned and uninhabitable. The Cameron court held that "under the facts of this case, a television, a couch, and a platter of food are insufficient attributes of a home, and so failed to call the protection against unreasonable searches and seizures into play." Id., 385 Pa.Superior Ct. at 499-501, 561 A.2d at 787-788. The court concluded that "under the Pennsylvania Constitution, as well as under the Constitution of the United States, it is unreasonable to expect that one has a privacy interest in an abandoned structure which is not one's dwelling place." Id., 385 Pa.Superior Ct. at 498-499, 561 A.2d at 786-787. We find nothing to distinguish this case from Cameron. Appellant likewise can claim no cognizable constitutional violation.
Moreover, we agree with the trial court that exigent circumstances existed which justified immediate warrantless entry into the premises. Even if the premises here had been appellant's "home" sufficient to establish a legitimate expectation of privacy, the necessity to obtain a search warrant was obviated by the exigent circumstances confronting the police.
It is well-settled that exigent circumstances excusing the warrant requirement arise where the need for prompt police action is imperative. See Commonwealth v. Maxwell, 505 Pa. 152, 477 A.2d 1309 (1984); Commonwealth v. Ehrsam, 355 Pa.Super. 40, 512 A.2d 1199 (1986), *36 appeal denied, 515 Pa. 573, 527 A.2d 535 (1987), cert. denied, Ehrsam v. Pennsylvania, 493 U.S. 932, 110 S.Ct. 321, 107 L.Ed.3d 311 (1989). Exigent circumstances can be generated when evidence sought to be preserved is likely to be destroyed or secreted from investigation, or because the officer must protect himself from danger to his person by checking for concealed weapons. Commonwealth v. Holzer, 480 Pa. 93, 102, 389 A.2d 101, 106 (1978). Whether exigent circumstances exist depends on "an examination of all of the surrounding circumstances in a particular case,.... These circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized." Commonwealth v. Hinkson, 315 Pa.Super. 23, 27, 461 A.2d 616, 618 (1983). Here, the trial court found that the factors facing the police supported invoking the exigent circumstances exception to the warrant requirement. We agree.
The police had ample probable cause to believe that narcotics were being distributed from the premises of 2001 West Turner Street. Their belief was supported by the informant's tip, their knowledge of the typical "gate house" operation, and, of course most crucially, by the recent purchase of cocaine by Officer Powell through the hole in the barricaded front door. The police knew that the evidence and the narcotics trafficker were on the premises at the time of the buy but that moments after the seller had handled the money, his hands would be stained with a telltale, vibrant blue dye. Clearly, the discovery of the dye would alert the seller to the police presence, causing him to destroy the evidence and/or flee the premises. The use of the dye made prompt police action imperative. Packets and vials of cocaine are easily hidden or destroyed and it is reasonable to infer that had the occupants of the gate house become aware of the dye, the evidence necessary for conviction would immediately have been lost. In fact, even absent the blue dye investigative technique, the modus operandi of the "gate house" operation made it unlikely that, had the police left to obtain a warrant, any remnants of the operation *37 would have remained upon their return.[17] Moreover, as soon as the police knocked and announced themselves, they heard noises inside the structure which convinced them that immediate entry was necessary to avoid destruction of evidence and escape.
We emphatically reject appellant's suggestion that the police deliberately created the exigencies here in order to circumvent the fourth amendment.[18] The general principle, cited to us by appellant, that the police "cannot deliberately create exigent circumstances in order to subvert the warrant requirements of the Fourth Amendment,"[19] is undoubtedly a sound concept but it is inapplicable here. The issue is not whether some action undertaken by the police in the performance of their duties contributed to the circumstances which created the exigencies justifying a warrantless entry. Rather, the inquiry is whether the police manufactured the exigency in a deliberate attempt to avoid the warrant requirement. The reasonableness of the police conduct depends upon the totality of the circumstances, not the least of which is "the nature of the investigation of which the warrantless activity is a part." See United *38 States v. Webster, supra note 19, 750 F.2d at 327-328. If the police used a reasonable and legitimate technique which was employed for independent investigative purposes, apart from a desire to "invent" exigent circumstances, the police actions will not invalidate the warrantless entry. See United States v. Socey, 846 F.2d 1439, 1448-1449 (D.C.Cir.), cert. denied, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988) ("the police should not be taxed with having failed to cover every eventuality.... As long as police measures are not deliberately designed to invent exigent circumstance, we will not second-guess their effectiveness").[20]
In the instant case, we agree with the trial court that "[i]t was the defendant's manner of conducting his drug sale business that created the exigency." The trial court stressed that the investigative technique employed by the police here, i.e., the use of the pre-recorded dyed money, resulted from appellant's sale of the narcotics through a impregnable, opaque barrier. The tactic was designed to frustrate police ability to identify anyone inside the "gate house." The use of the dye to verify the identity of the drug trafficker was a reasonable, indeed arguably necessary, investigative tool. It served an independent and legitimate purpose as part of an ongoing investigation, the nature of which was dictated primarily by appellant's narcotics distribution scheme. There is no support for appellant's suggestion that the police unnecessarily created the exigency deliberately to by-pass the warrant requirement. We decline to relegate the police to investigative methods which would afford criminals greater success in evading *39 justice. We conclude that there was nothing unreasonable in the police action at issue here.
Judgment of sentence affirmed.
POPOVICH, J. files a dissenting opinion.
HOFFMAN, J. files a concurring opinion.
POPOVICH, Judge, dissenting:
On appeal, we have the luxury of a full record which allows us to review claims of error "after the fact." As a result, too often when we assess a case, our vision becomes clouded by the benefit of hindsight. Unfortunately, I believe that is what has occurred in this case.
I see no reason why the police did not procure a search warrant before effecting an entry into the gate house. By failing to obtain a warrant through accepted procedures, which were absolutely feasible under the facts of this case, the police instead manufactured exigent circumstances to conduct a search. Because I feel that the methods employed by the police violated the appellant's rights, I respectfully dissent.
In the alternative, I note that the police did not determine that the gate house was a structure unfit for habitation until after they had entered it. Thus, the majority's comprehensive discussion regarding an individual's right to privacy in the home, is immaterial. One cannot fairly decide what constitutes a home after one sees the interior of a building. Rather, the police should have obtained a search warrant, based on their probable cause to believe that the fortified structure was being used as an outlet for illegal drug distribution. Then, there would have been no need to discuss the elements of a "home," for clearly, regardless of the furnishings, operating a drug distribution center is violative of the law.
I begin this discussion by recognizing the long-standing principle that warrantless searches are presumed unreasonable unless the search is justified by an exception to the warrant requirement. Commonwealth v. York, 381 Pa.Super. *40 55, 552 A.2d 1092 (1989). In Coolidge v. New Hampshire, 403 U.S. 443, 454, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971) the United States Supreme Court stressed, "[a]s a general rule a search or seizure without a warrant is deemed unreasonable for constitutional purposes." While the majority correctly states "that exigent circumstances excusing the warrant requirement arise where the need for prompt police action is imperative",[1] I note that such a situation is the exception to the rule. As has been noted by many courts, scholars and legal commentators, it is of utmost importance that the exceptions to any rule do not operate to swallow the original principle. Commonwealth v. Conn, 377 Pa.Super. 442, 547 A.2d 768 (1988); Commonwealth v. Weik, 360 Pa.Super. 560, 521 A.2d 44 (1987); Commonwealth v. Daniels, 280 Pa.Super. 278, 286, 421 A.2d 721, 725 (1980) ("[a]ll decisions made pursuant to the exigent circumstances exception must be made cautiously, for it is an exception which by its nature can very easily swallow the rule unless applied only in restricted circumstances."); Commonwealth v. Cubler, 236 Pa.Super. 614, 626, 346 A.2d 814, 820 (1975).
The majority aptly sets forth the law as it relates to "exigent circumstances." See Majority opinion, at 35-36. A police officer may circumvent the warrant requirement in the event of exigency; in the instant case, to avoid the destruction of evidence. Commonwealth v. Holzer, 480 Pa. 93, 102, 389 A.2d 101, 106 (1978); Commonwealth v. Ehrsam, 355 Pa.Super. 40, 512 A.2d 1199 (1986). See generally Commonwealth v. Rodriguez, 526 Pa. 268, 585 A.2d 988 (1991) (defines probable cause); Commonwealth v. Kendrick, 340 Pa.Super. 563, 490 A.2d 923 (1985) (accord). The determination of whether exigencies necessitated forgoing the procurement of a warrant is based on an examination of all of the surrounding circumstances. Commonwealth v. Harris, 429 Pa. 215, 239 A.2d 290 (1968); Commonwealth v. Hinkson, 315 Pa.Super. 23, 27, 461 A.2d 616, 618 (1983). See Commonwealth v. Ariondo, 397 Pa.Super. 364, 580 *41 A.2d 341 (1990). See also Commonwealth v. Jones, 391 Pa.Super. 292, 570 A.2d 1338 (1990).
Here, I have reviewed the facts of this case as they appear in the record and as they are related by the majority in its opinion. See Majority opinion, at 24-27, 35-39. After reading all of the pertinent materials, I conclude that the police did not encounter exigent circumstances sufficient to relieve them of the duty to obtain a search warrant.
The majority writes, "The issue is not whether some action undertaken by the police in the performance of their duties contributed to the circumstances which created the exigencies justifying a warrantless entry. Rather, the inquiry is whether the police manufactured the exigency in a deliberate attempt to avoid the warrant requirement." Majority opinion, at 35-39. I do not believe that these issues are mutually exclusive. I am convinced that the police, by their actions, created exigent circumstances. Cf. Commonwealth v. Ariondo, 397 Pa.Super. 364, 580 A.2d 341 (1990). However, this is not to imply that they "invented" such circumstances purposely or with a deliberate intent to validate the warrantless entry. Nor am I suggesting that we "second-guess their effectiveness." See Majority opinion, at 38.
My concern is that the police utilized an incorrect procedure which in turn led to a mistake of constitutional proportions. The fact that the infringement yielded evidence of crime does not cure the original defect, much less justify it.[2] Conversely, to set precedent in the manner advocated by the majority is, in effect, to erode further the protections afforded through the Fourth Amendment. This comment is not meant to condone illegal activity, but rather to recognize that individual rights are of paramount importance in our society, and to rationalize exceptions to the exceptions is to render the constitutional provisions meaningless. Cf. Ariondo, supra. This was not a difficult case. Unfortunately, as we have noted time and time again, hard cases *42 can make bad law. See Commonwealth v. Nicholas, 405 Pa.Super. 242, 592 A.2d 98 (1991); Commonwealth v. Schwartz, 304 Pa.Super. 125, 128, 450 A.2d 133, 134 (1982); Commonwealth v. Kjersgaard, 276 Pa.Super. 368, 379, 419 A.2d 502, 508 (1980) (Gates, J., dissenting); In re Butler Tp. School Dist., 158 Pa. 159, 166, 27 A. 849, 851 (1893).
The majority reproduces only a part of the Fourth Amendment. Majority opinion, at 26. Thus, I feel compelled to set forth its provisions, in full, below.
The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
U.S. CONST. amend. IV. Cf. PA. CONST. art. I, § 8. Here, the police had, or could have had, sufficient probable cause to obtain a search warrant properly. See N.T., March 2, 1990, at 5-7. See Majority opinion, at 24-25, 35-37. See Appellant's brief, at 21.[3] Probable cause was formed, or could have been formed, before Officer Powell purchased the drugs with the recorded ten dollars. He certainly had enough information, or could have obtained information sufficient to conclude that the gate house operators were engaged in illegal activities. See N.T., March 1, 1990, at 5, 24. See Commonwealth v. Conn, 377 Pa.Super. 442, 547 A.2d 768 (1988).
Even if Officer Powell was unsure that the gate house was an illegitimate enterprise, there is no indication that the occupants were engaged in a "one time" business. Officer Powell could have made a purchase using an untreated bill.[4] After receiving the drugs, he could have procured a search *43 warrant.[5] Then, to apprehend the dealer, he could have exchanged the ten dollar bill containing the blue dye formula, for the cocaine. Once Officer Powell was in possession of the evidence, he could have entered the building to effectuate an arrest.[6]See Commonwealth v. Brundidge, 404 Pa.Super. 106, 119, 590 A.2d 302, 309 (1991) (where no exigent circumstances existed, the search of a jacket left in a hotel room should have been conducted pursuant to a judicial warrant issued upon probable cause). Cf. Commonwealth v. Rodriguez, 387 Pa.Super. 271, 564 A.2d 174 (1989), appeal granted 526 Pa. 632, 584 A.2d 315 (1990). See also Commonwealth v. Reviera, 387 Pa.Super. 196, 199-208, 563 A.2d 1252, 1253-57 (1989)[7] (discussing anticipatory search warrants).
The facts before this Court do not convince me that there was exigency. In fact, the majority writes that the "[a]ppellant had been in bed with a woman who likewise had blue dye on her body," which indicates to me that the drug seller may not have even noticed the dye. The record does not reveal the appellant's presence of mind at the time of the search, but evidently he did not attempt to dispose of the soiled bill. It was found in his pants pocket. N.T., March 1, 1990, at 19. Majority opinion at 25. Thus, I find questionable, *44 or at least debatable, the majority's conclusion that "[c]learly, the discovery of the dye would alert the seller to the police presence, causing him to destroy the evidence and/or flee the premises." Majority opinion at 36.[8]Cf. Appellant's brief, at 16-17.
In sum, I read the law as does the majority. When I apply the facts of this case, however, I cannot conclude that Officer Powell, in conducting his investigation, was confronted with such emergency circumstances that he could not get a search warrant. See Commonwealth v. Rispo, 338 Pa.Super. 225, 231, 487 A.2d 937, 940 (1985). The nature of the appellant's infractions were such that a warrant could have been procured before any buys occurred.[9] Thus, I would be constrained to find that the police employed methods that were neither "reasonable" nor "legitimate." I would have reversed the trial court's denial of the appellant's motion to suppress.[10] Because the evidence *45 was used subsequently to convict the appellant, here, I would vacate the judgment of sentence and remand this case for a new trial.
I also dissent to the majority's classification of a home. First, I would not have reached this issue in light of my preferred disposition of the instant case, as outlined above. Second, even if I were to conclude that the police encountered exigent circumstances sufficient to justify the pursuit of a warrantless entry, still I would hesitate to discuss this claim. There would be no need to engage in further constitutional analysis if the appellant's case could be resolved without such an evaluation. Cf. Ballou v. State Ethics Commission, 496 Pa. 127, 436 A.2d 186 (1981); Mt. Lebanon v. County of Bd. of Elections of Allegheny County, 470 Pa. 317, 322, 368 A.2d 648, 650 (1977) (when cases contain both constitutional and non-constitutional issues, we should not reach the merits of the constitutional claims if the case may be decided properly on non-constitutional grounds). Furthermore, if exigent circumstances existed, then the appellant's "expectation of privacy" argument would be defeated simply by the nature of the activity which gave rise to probable cause. See generally Commonwealth v. Holzer, 480 Pa. 93, 102, 389 A.2d 101, 106 (1978) (exigent circumstances except the warrant requirement).
In any event, I disagree with the majority's characterization of a "home" inasmuch as this case implicates the Fourth Amendment and we must be careful in interpreting its provisions. Commonwealth v. Conn, 377 Pa.Super. 442, 547 A.2d 768 (1988). Most basically, I advance a two-pronged proposition. First, the quality of one's living quarters has nothing to do with one's right of privacy. Second, I believe that the appellant maintained a right of privacy, because the police did not know what lurked behind the store-front until they were inside. See N.T., March 1, 1990, at 16-17. See also id. at 35-36.[11] Had the police found *46 adequate living quarters, then the majority's discussion would be very different.
The point that I wish to stress is that the discussion should not be any different. Furnishings are irrelevant to an evaluation of one's privacy expectations. At the same time, the Katz case, decided by the United States Supreme Court, distinguishes the objective and subjective expectations of privacy and allows us to discern the legitimacy of one's expectations versus the reasonableness of those expectations as perceived by society. Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). See also Commonwealth v. Blystone, 519 Pa. 450, 549 A.2d 81 (1988), cert. granted in part by Blystone v. Pennsylvania, 489 U.S. 1096, 109 S.Ct. 1567, 103 L.Ed.2d 934 (1989), aff'd 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990).
In Commonwealth v. Lemanski, 365 Pa.Super. 332, 529 A.2d 1085 (1987), this Court, discussing the Fourth Amendment, found that the appellant had a reasonable expectation of privacy in his greenhouse, which was attached to his home. The appellant was convicted of possession of a controlled substance and manufacture of marijuana as a result of police surveillance by means of binoculars specially equipped with zoom lenses. In reversing and remanding the appellant's case for a new trial, this Court engaged in a comprehensive Fourth Amendment analysis and reminded us of the following principles.

*47 The Fourth Amendment protects the rights of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. A search within the meaning of the Fourth Amendment occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. Whether or not a person who invokes the protection of the Fourth Amendment may claim a "reasonable expectation of privacy" is determined by two inquiries: (1) whether, by his conduct, the person has exhibited an actual (subjective) expectation of privacy; and (2) whether that expectation of privacy is one that society is prepared to recognize as reasonable.
Id., 365 Pa.Superior Ct. at 345, 529 A.2d at 1091 (quotation marks and citations omitted). With these standards in mind, the Lemanski court found that the greenhouse, which was within the curtilage area of the appellant's house, was entitled to Fourth Amendment protections. This Court, recognizing that the Fourth Amendment protects people and not places, concluded that the occupants of the house enjoyed a reasonable expectation of privacy in the curtilage and that that expectation of privacy was one that society is willing to accept. Id., 365 Pa.Superior Ct. at 349, 529 A.2d at 1093.
Here, I am willing to concede that the appellant was using an abandoned store front to conceal his illegal business. I also recognize that the Fourth Amendment was not designed to protect the situs of unlawful activity. However, as the Lemanski court aptly stated,
we emphasize that the Fourth Amendment makes no distinctions between lawful and unlawful conduct. We cannot, in hindsight, choose to protect unlawful conduct with less vigor. Rather, we must balance legitimate law enforcement techniques and the legitimate privacy rights of citizens in a free and open society.
Id., 365 Pa.Superior Ct. at 349, 529 A.2d at 1093. I echo the rationale of Justice Powell in California v. Ciraolo, 476 U.S. 207, 226 n. 11, 106 S.Ct. 1809, 1819 n. 11, 90 L.Ed.2d 210 (1986) (dissenting), wherein he noted that while the right of privacy in the home does not encompass the right to pursue unlawful activity, the Fourth Amendment requires *48 the police to secure a search warrant before intruding upon an individual's privacy.
In sum, I find that the warrantless search of the premises in issue violated the appellant's Fourth Amendment rights. I conclude that no exigent circumstances existed which precluded the police from obtaining a warrant. As a result, the entry into the structure was violative of the Constitution and there is no need to reach the issue of whether the building was a home. Even if I were to reach the issue of whether the appellant was entitled to a privacy right in the storefront, which ultimately proved not to be a dwelling, I would be constrained to find that the appellant manifested a subjective expectation of privacy and that society would be willing to accept one's occupation of a store front as reasonable.[12] While this conclusion sounds harsh and may be unpopular, I reach it only because the determination that the store was not a dwelling house was made in hindsight.[13] Had the police entered the structure to find a more suitable residence, the result (or at least the evaluation), under the majority's analysis, would be different. This cannot be.
Illegal activity cannot be condoned. However, I cannot overlook the warrant requirement.[14] I am confident in the strength of my argument, especially here, where the record fully supports my position.
First, to procure a warrant (at the very onset) would have presented a minimal burden to the police officers. Simultaneously, such a procurement would have legalized the police *49 activity. Second, by conforming to the constitutional mandate, there is no doubt in my mind that the evidence seized as a result of the investigation would have been admissible. Third, the police had available to them a host of options which, in my view, would have resulted in the confiscation of drugs and the arrest(s) of the accused individuals. By not pursuing their options, the police officers effectuated an illegal search. Much more importantly, by failing to entertain even the thought of securing a search warrant, I believe that the police violated the appellant's Fourth Amendment rights to an extent that is inexcusable. I disagree with the majority's attempts to justify misbehavior in an effort to legitimize certain ends.
As our Supreme Court stated in Commonwealth v. Miller, 513 Pa. 118, 127, 518 A.2d 1187, 1192 (1986) and as this Court aptly quoted in Lemanski, supra,
To maintain freedom for all we must maintain an ordered society, which requires that we effectively enforce our laws. Thus, the strictures that are to be applied to preserve our freedom must never be allowed inadvertently to provide the vehicle for undermining it. Of equal concern is that we guard against surrendering in fear, in a perceived lawless era, fundamental protections that are essential to the preservation and maintenance of our free society.
Miller, 513 Pa. at 127, 518 A.2d at 1192, cited by Lemanski, 365 Pa.Super. at 349, 529 A.2d at 1093.[15] I believe that this case exemplifies the need for reiteration of the above principles.
Therefore, I respectfully dissent.
HOFFMAN, Judge, concurring:
I agree with Judge Beck that sufficient exigent circumstances existed to allow for the warrantless entry into the premises in question. I therefore concur in the decision to affirm the judgment of sentence. I wish to emphasize, *50 however, the very limited scope of this decision. The police officers unquestionably created the exigency by choosing to employ the blue dye to identify the person who sold them cocaine. Although we frown on such "police-created" exigencies as a general matter, I agree with Judge Beck and the court below that the tactic employed in this case was reasonable only because of the unique nature of a "gate house."
I ordinarily would not reach the alternative argument concerning whether appellant had a reasonable expectation of privacy in the premises. Because both the majority and the dissent have addressed the issue, however, perhaps it is better that I offer some comment.
The lead opinion would hold that "appellant had no constitutionally-protected expectations of privacy in the premises searched and as such the police entry did not infringe on fourth amendment rights." Majority opinion at 24. I cannot agree with this approach. I believe that in an "automatic standing" case such as this, a focus on the particular defendant's expectation of privacy, rather than the lawfulness of the police conduct, is improper under our Supreme Court's decision in Commonwealth v. Sell, 504 Pa. 46, 470 A.2d 457 (1983). Pursuant to Sell, there is no question that appellant, who was charged with possessing the drugs that were seized after the police entry, had "automatic standing" to challenge the constitutionality of that action under Article I, § 8 of the Pennsylvania Constitution. See 504 Pa. at 67-68, 470 A.2d at 469; see also Commonwealth v. Peterkin, 511 Pa. 299, 309-10, 513 A.2d 373, 378 (1986), cert. denied, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987); Commonwealth v. Treftz, 465 Pa. 614, 351 A.2d 265 (1976), cert. denied, 426 U.S. 940, 96 S.Ct. 2658, 49 L.Ed.2d 392 (1976). In this regard, the state constitution is more protective of individual privacy rights than the fourth amendment of the United States Constitution. See United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d *51 619 (1980); see also Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The reason for this broader rule, the Sell Court emphasized, is that respect for the particular defendant's "legitimate expectation of privacy" (the focus of Rakas) is not the only reason justifying inquiry in these cases: in light of the protection of Article I, § 8, there also is an abiding interest to ensure review of the "critical element" of whether the governmental intrusion was unreasonable. 504 Pa. at 60, 470 A.2d at 468-69. As I read Sell, by so emphasizing, the Court directs that a review shall be made of the reasonableness of a governmental intrusion even in cases where the particular defendant's rights were not affected not by the intrusion itself. The Sell rule makes perfect sense in light of the Court's expressed concern with, and focus on, not only the violation of the particular defendant's right, but protecting against illegal governmental conduct. In effect, then, Sell allows for the vicarious assertion of privacy rights, at least so long as the defendant has a real stake in the outcome  i.e., whenever his or her alleged "possession" of the item(s) seized pursuant to the illegal police conduct forms the basis of the prosecution. See Commonwealth v. Peterkin, supra. This rule thus provides significantly greater protection for the privacy of individuals under our state constitution.
The approach followed in Commonwealth v. Cameron, 385 Pa.Super. 492, 561 A.2d 783 (1989), allocatur denied, 525 Pa. 576, 575 A.2d 108 (1990), and the lead opinion is inconsistent with the letter and spirit of Commonwealth v. Sell. To grant a defendant automatic standing without regard to whether the police conduct affected his rights, but then to refuse to evaluate the substantive question of the reasonableness of that governmental conduct on the ground that the defendant lacks a "reasonable expectation of privacy," renders meaningless the careful distinction the Sell Court drew between Article I, § 8 and the fourth amendment. *52 Indeed, if the reasonableness of a governmental intrusion can be evaluated only when the search or seizure implicated the particular defendant's reasonable expectation of privacy, the Sell rule is identical in all practical respects to the federal approach. I find it hard to believe that Sell stands only for the proposition that, when the court inevitably denies the defendant's motion to suppress, it is imperative to announce that there is "no reasonable expectation of privacy" rather than no standing. If the Sell Court intended this result, it would have been much easier simply to adopt Salvucci.
In my view, the remaining, and vital, importance of the "reasonable expectation of privacy" test after Sell is in evaluating the police conduct at issue and not the particular defendant's expectations. Simply put, this evaluation is to determine whether a "search" or "seizure" occurred. Police conduct does not implicate the fourth amendment or Article I, § 8 (i.e., does not constitute a "search" or "seizure") unless the area involved is one in which a person has a reasonable expectation of privacy. See, e.g., Commonwealth v. Oglialoro, 525 Pa. 250, 256, 579 A.2d 1288, 1290-91 (1990).[1] The point of Sell, however, is that, at least in certain instances, that person need not be the defendant. Thus, for example, if police illegally enter a private home, they have violated a reasonable expectation of privacy  whether the owner was there or not, whether evidence was *53 seized or not, indeed, whether the owner was aware or not. And that illegal conduct, under Sell, will disentitle the Commonwealth to the use of evidence illegally seized, as against any defendant who is facing charges premised on his or her "possession" of that evidence. Conversely, a police officer can seize contraband that is left in plain view, or is abandoned, because no person can have retained a reasonable expectation of privacy in it. It is not the identity of the defendant that legitimizes the seizure; it is the fact that the police action does not violate a reasonable expectation of privacy.
Thus, my focus would not be simply on whether this defendant possessed a reasonable expectation of privacy in the premises, but on whether the police intrusion here implicated a reasonable expectation of privacy, which appellant, because of the possessory offense, can vicariously assert. On this question, I agree with Judge Popovich that we must look not to what police ultimately found with regard to appellant's interest in the property, but to what was known at the time of entry. And, like Judge Popovich, I am satisfied that a reasonable expectation of privacy exists in a structure such as the one involved here.[2]
NOTES
[1] One or two rooms on the upper floors of the building contained "boarders" who were discovered by police. They did not appear to have any active role in the gate-house narcotics operation. (See note 13, infra.) In response to Judge Popovich's dissent, we point out that the polices' knowledge of the condition of the structure is not the proper focus in analyzing the fourth amendment issue. The proper focus is the defendant's legitimate expectation of privacy.
[2] We fail to understand appellant's reliance on Commonwealth v. Sell, 504 Pa. 46, 470 A.2d 457 (1983) and the concurring opinion's suggestion that Sell dictates a different constitutional analysis from that which we have herein undertaken. In Sell the supreme court retained Pennsylvania's "automatic standing" rule which permits those charged with a possessory offense to assert a suppression claim and challenge the legitimacy of the governmental action. Sell did not, in itself, nor in subsequent application purport to resolve the merits of the constitutional claim raised. As Judge Hoffman notes in his concurrence, Sell admonishes us as a reviewing court to focus on "the need for protection from illegal governmental conduct offensive to the right of privacy". Sell, 504 Pa. at 65, 470 A.2d at 468. However, whatever misgivings the Sell court initially intimated regarding the adoption of the defendant's "legitimate expectation of privacy" as the touchstone of constitutional protection against governmental intrusion, it is now clear that the courts of this Commonwealth have consistently embraced and applied this standard. In fact, in Commonwealth v. Oglialoro, supra, 525 Pa. at 254-256, 579 A.2d at 1290-1291, a possession of marijuana case in which the defendant presumably had "automatic standing", the supreme court stated:

To prevail successfully on a claim of governmental invasion of privacy, [this defendant] is required first to show that a subjective expectation of privacy exists as to the area being searched. An expectation of privacy is present when the individual, by his conduct, "exhibits an actual (subjective) expectation of privacy" and that the subjective expectation "is one that society is prepared to recognize as "reasonable."
(citations omitted).
This is precisely the analysis employed here to determine whether the governmental action offended a protected zone of privacy. After Oglialoro, supra; Commonwealth v. Blystone, 519 Pa. 450, 456, 549 A.2d 81, 87 (1988); Commonwealth v. Brundidge, supra; Commonwealth v. Ferretti, 395 Pa.Super. 629, 577 A.2d 1375, appeal denied, 589 A.2d 688 (1991); Commonwealth v. Cameron, 385 Pa.Super. 492, 561 A.2d 783, (1989) appeal denied, 525 Pa. 576, 575 A.2d 108 (1990); Commonwealth v. Kean, 382 Pa.Super. 587, 556 A.2d 374 (1989), it is clear in Pennsylvania that the focus of the inquiry for search and seizure challenges is the defendant's legitimate expectation of privacy.
[3] Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967).
[4] We realize that reasonable expectations of privacy certainly extend to activities and conduct which can be characterized as non-spatial or non-physical. Intrusions into zones of privacy surrounding personal and professional communications often implicate fourth amendment issues and do not involve expectations of privacy in a physical place or material effect. Government intrusions into these areas frequently involve sophisticated techniques of electronic surveillance and can often conjure up alarming, Orwellian invasions of privacy. Nevertheless, these cases, as well as the instant case, are subject to the same constitutional analysis, i.e., can the person invoking protection claim a legitimate expectation of privacy against government action?
[5] The "sanctity of a man's home and the privacies of life" form the core of constitutional concern. Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886).
[6] "Certainly the safeguarding of the home does not follow merely from the sanctity of property rights. The home derives its preeminence as the seat of family life. And the integrity of that life is something so fundamental that it has been found to draw to its protection the principles of more than one explicitly granted Constitutional right." Poe v. Ullman, 367 U.S. 497, 551-552, 81 S.Ct. 1752, 1781, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting).
[7] Stoner v. California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).
[8] Marshall v. Barlow's Inc., 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978).
[9] This court recently held that an individual who appeared to be no more than a casual visitor in a friend's apartment had no reasonable expectation of privacy therein. Commonwealth v. Ferretti, supra, 395 Pa.Super. at 639, 577 A.2d at 1381 (1990). Accord, United States v. McNeal, 735 F.Supp. 738 (N.D.Ohio 1990) (holding that Minnesota v. Olson is limited to overnight guests and should not be extended to someone who is nothing more than a casual visitor who is there to use the phone).
[10] "Expectations, of privacy are established by general social norms." Robbins v. California, 453 U.S. 420, 428, 101 S.Ct. 2841, 2847, 69 L.Ed.2d 744 (1981) (plurality opinion), overruled on other grounds, United States v. Ross, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982).
[11] In our view, it would demean and offend the "sanctity of the home" to find that an individual has a legitimate expectation of privacy in this structure. The record is unassailed that the sole use of the premises here was as a narcotics trading post. We query, as did Justice Papadakos in his Concurring Opinion in Support of Affirmance in Commonwealth v. Lopez, 525 Pa. 185, 191, 579 A.2d 854, 857 (1990):

Do we really mean to protect those "homes" which are nothing more than warehouses for the storage of drugs which are to be illegally sold, or for storerooms in which these drugs are illegally sold, or kitchens in which these drugs are cooked and manufactured for illegal sale.... What is the nature of this "home" we so desperately seek to protect from the intrusion of governmental stormtroopers?
(emphasis supplied).
[12] The Georgia Court of Appeals characterized the fourth amendment protection given to a tent in which the defendant lived as follows:

Though a tent may not provide the sturdy protection against the winds, the rains, the heat, and the cold, which a customary house provides, the tent-dweller is no less protected from unreasonable government intrusions merely because his dwelling has walls of canvas rather than walls of stone. A dwelling place, whether flimsy or firm, permanent or transient, is its inhabitant's unquestionable zone of privacy under the fourth amendment, for in his dwelling a citizen unquestionably is entitled to a reasonable expectation of privacy.
Kelley v. State, 146 Ga.App. 179, 245 S.E.2d 872, 874-875 (1978).
Just as the canvas walls in Kelley did not rob the tent of constitutional protection, so the barricades and fortifications here do not alone supply fourth amendment coverage to a structure which cannot in any way be described as appellant's home.
[13] The fact that there were a couple of "boarders" occupying one or two rooms in the upper part of the building is not determinative of appellant's legitimate expectations of privacy in the barricaded storefront. There was no evidence to suggest that appellant himself boarded in the building; in fact he indicated to police that he resided elsewhere. Moreover, there was noone living in the vacant storefront itself where the warrantless entry took place.
[14] We use the word "abandoned" in a descriptive sense to point out that the prior legitimate use of the premises had been abandoned and the structure remained vacant. We do not use "abandoned" in the sense often used in search and seizure cases to conclude that an individual who has abandoned particular property no longer can claim a legitimate expectation of privacy therein. See, e.g., Commonwealth v. Cihylik, 337 Pa.Super. 221, 486 A.2d 987 (1985).
[15] We do not imply that the criminal nature of the activity performed in the structure controls whether fourth amendment protection should apply. Had appellant been dispersing drugs out of his bedroom in his home clearly he would have been able to claim a legitimate expectation of privacy. Plainly, his conduct would be no less violative of the law but society could not sanction police entry into his home absent a warrant or exigent circumstances. On the other hand, as this opinion makes clear, appellant cannot claim a legitimate expectation of privacy based solely on his use of this structure as a way-station for the dispersal of drugs. The presence of illegal activity coupled with appellant's obvious subjective intent to shelter his conduct from official view do not together create a legitimate expectation of privacy.
[16] Although uttered in another context, we agree with Judge Kelly's observation that "[the protection against unreasonable search and seizure] was intended to prevent oppression, and not to assist criminals in efforts to erect barriers to the discovery of truth." Commonwealth v. Schaeffer, 370 Pa.Super. 179, 256, 536 A.2d 354, 393 (1987) (Kelly, J., concurring and dissenting).
[17] Suppression hearing testimony was that a "very fast turnover" typifies gate-house operations. Therefore, according to the officers, given the time it takes to secure a warrant, chances were "pretty slim" that the sellers would still be on the premises when the police returned. Moreover, the police testified that effective surveillance of the building while a warrant was being secured was impossible. The police had no idea where possible routes of exit were located and any attempt to find them would, according to the testimony, have alerted the occupants to their presence. Destruction of evidence surely would have followed.
[18] See State v. Hutchins, 116 N.J. 457, 457, 561 A.2d 1142, 1144 (1989), in which the New Jersey Supreme Court surveys the current law on exigent circumstances, including so-called "police-created exigencies." In Hutchins, the court concludes, "[even where] the exigent circumstance can properly be described as `police-created,' it may have arisen as a result of reasonable police investigative conduct intended to generate evidence of criminal activity. In that context, the exigency of potential destruction of narcotics, if accompanied by probable cause, could support a warrantless entry into the premises." We think this language accurately describes what occurred in the instant case.
[19] United States v. Webster, 750 F.2d 307, 327 (5th Cir.1984), cert. denied, 471 U.S. 1106, 105 S.Ct. 2340, 85 L.Ed.2d 855 (1985).
[20] A panel of this court recently addressed the issue of police-created exigencies in Commonwealth v. Ariondo, 397 Pa.Super. 364, 580 A.2d 341 (1990). In our view, the facts in Ariondo bear no resemblance to the instant case. The exigency created by the police in Ariondo (i.e., the inexplicable removal of the vast bulk of cocaine being delivered to the defendant, leaving only a fraction of the delivery in the package) appeared to serve no independent, legitimate investigative purpose unrelated to the warrant requirement. By contrast, the trial court here found that the use of the blue dye was reasonable, necessary and, most importantly, inspired by the nature of the defendant's criminal enterprise. Therefore, Ariondo is wholly inapposite.
[1] Majority opinion at 35.
[2] See Commonwealth v. Conn, 377 Pa.Super. 442, 452, 547 A.2d 768, 773 (1988).
[3] Commonwealth v. Dumont, 370 Pa.Super. 155, 536 A.2d 342 (1987) (an affidavit in support of a search warrant need only set forth the probability of criminal activity, not a prima facie case).
[4] See N.T., March 1, 1990, at 46-47. Officer Powell acknowledged that "another way of going about this would have been to make a buy without using that dye, and just [by using] regular, marked money...." Id. at 46.
[5] See N.T., March 1, 1990, at 35. (Q. "In Philadelphia, they have a mechanism whereby one can obtain Search Warrants 24 hours a day, through the Bail Commissioner, at the Police Administration Building; is that right?" A. "That's correct.").
[6] The exigent circumstances in this case certainly arose out of police investigative conduct. However, I am not persuaded that the actions of the law enforcement agents were reasonable. See Commonwealth v. Conn, 377 Pa.Super. 442, 547 A.2d 768 (1988). Therefore, I can not adopt the majority's reliance on State v. Hutchins, 116 N.J. 457, 561 A.2d 1142 (1989) as applicable here. See Majority opinion, at 37, n. 18. Also, as I previously expressed in the body of this dissenting opinion, I do not attribute mal-intent or deliberate misconduct to the police officers who worked on this case. Nevertheless, good faith does not relieve the officers of their duty to act reasonably and within the confines of the rules whenever possible. Cf. Hutchins, supra at 472-473, 561 A.2d at 1151.
[7] Appeal granted 525 Pa. 598, 575 A.2d 564 (1990); appeal dismissed 526 Pa. 41, 584 A.2d 308 (1991). An anticipatory search warrant would have been of exceptional use in the instant case. Then, the problem of false exigency could have been avoided.
[8] The majority determines, in part, that the use of the blue dye was a reasonable tactic, designed to aid in the investigation and eventual apprehension and identification of the drug dealer. Majority opinion at 38. While I do not dispute the effectiveness of this method, I am simply disturbed by the procedure employed. The exception to the warrant requirement should never have taken effect here, for there should have been a warrant. Moreover, the investigative purpose of the dye may have been unrelated to the warrant requirement, but this does not negate the constitutional mandate! See Majority opinion at 38, n. 20, 38. See also N.T., March 1, 1990, at 30-31. See Appellant's brief, at 8. The warrant requirement may be excused under limited circumstances, one being exigency. See Commonwealth v. Rispo, 338 Pa.Super. 225, 487 A.2d 937 (1985). Yet, if a warrant can be obtained, then using a bill treated with indelible ink to discover or confiscate evidence of illegal activity before procuring the warrant does not excuse the lack of procurement. It only makes the error more glaring. Cf. Commonwealth's brief, at 19.
[9] Instead, Officer Powell admitted that the police made no effort at all to obtain a search warrant. See generally N.T., March 1, 1990. See id. at 31-32.
[10] I add here that the majority's sentiments, appearing at page 19 of its slip opinion, are well-taken. However, I do not feel that by my suggestions the police would be forced to engage in "investigative methods which would afford criminals greater success in evading justice." Rather, I feel that upholding individual rights, while encouraging efficient yet safe law enforcement, will further the purpose of the Constitution as well as implement confidence in our system.
[11] The court asked Officer Powell whether, in his experience with gate houses, people normally live there. Officer Powell stated, "not normally, no." The court then inquired, "But in this house, people were living at least on part of the first floor, on the second floor and on the third floor; is that correct?" Officer Powell replied as follows.

On the second and third floors, it was set up like a boarding home. There were a couple of people that had rooms in there. "Living," is a relative term. The place was really disgusting. In the room next to where he was, there was a five-gallon bucket with human feces and urine, and the bed that he was in  I wouldn't call it a bed.
Id. at 35-36. See also id. at 16-19. I do not find Officer Powell's comments probative of the issue on appeal, nor do I find his observations relevant, as they were made after entry. In fact, even if Officer Powell's testimony was material, it would tend to support the appellant's position; to wit, that the gate house was being occupied as a residence.
[12] See Moving Into Abandoned Housing, The Philadelphia Inquirer, July 9, 1991, at 1 (discussing "abandominiums"  deserted buildings that are providing shelter to the homeless).
[13] Similarly, it cannot be argued that because the appellant's home address differed from that of the gate house, the appellant could not have evidenced a subjective expectation of privacy in the structure. Inasmuch as the appellant gave his home address to the police after he had been apprehended, there is no way that the police could have been sure that the appellant did not live behind the storefront. N.T., March 1, 1990, at 22. Cf. id. at 34. Cf. Majority opinion at 34, n. 15.
[14] See McDonald v. United States, 335 U.S. 451, 455, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948).
[15] See also Commonwealth v. Newman, 429 Pa. 441, 448, 240 A.2d 795, 798 (1968). See Appellant's brief, at 24.
[1] Contrary to the suggestion in the lead opinion, I do not read Oglialoro as either expressly or impliedly overruling Commonwealth v. Sell and adopting the federal constitutional approach to automatic standing. Indeed, the concerns implicated in Sell were not at all present in this case: the defendant in Oglialoro was the owner of the property in question, and thus he did not need the automatic standing rule in order to contest the search. The Oglialoro Court focused on whether the police conduct implicated that owner's legitimate "reasonable expectation of privacy." I read Oglialoro as being perfectly consistent with Sell. If the Court had determined that the police action violated a reasonable expectation of privacy, and was unlawful, then, under Sell, any person charged with a possessory offense as a result of the search should be entitled to suppression of the fruits of the search.
[2] Although the premises here were used as a front for a drug operation, I share Judge Popovich's concern that the more likely use of an apparently "abandoned" storefront would be as a shelter to the homeless. See Dissenting Opinion by POPOVICH, J., at n. 12. I agree with Judge Popovich's suggestion that a reasonable expectation of privacy should attach in such a case. Cf. State v. Mooney, 218 Conn. 85, 588 A.2d 145 (1991).