561 A.2d 783

**COMMONWEALTH of Pennsylvania, Appellant**

v.

**Clifton CAMERON.**

Superior Court of Pennsylvania.

Argued April 19, 1989.

Filed July 6, 1989.

Deborah Fleisher, Assistant District Attorney, Philadelphia, for Com., appellant.

Peter J. Scuderi, Philadelphia, for appellee.

Before CIRILLO, President Judge, and MELINSON and HESTER, JJ.

CIRILLO, President Judge:

This is an appeal by the Commonwealth from an order entered by the Court of Common Pleas of Philadelphia County suppressing evidence obtained in the search of an abandoned house. The Commonwealth has certified that the order substantially handicaps its prosecution of the case. *See Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985).

The appellant, Clifton Cameron, was arrested by Philadelphia police for possession of a controlled substance, and

possession with intent to deliver. Police had made an arrest at the house in question on the day prior to Cameron's arrest. Police Sergeant Michael Perrone went back to the house the following day. He observed people going in and out of the vestibule of the house within a short time period in a manner which was, in his experience, consonant with the sale of narcotics. He called for assistance, and went into the vestibule, the door to which was ajar. He then knocked on the inner door, which he knew led to a room boarded off from the rest of the house, and announced himself as a police officer. Cameron, who was in the room, asked him to wait. Perrone could see packets of white powder lying on a table through a hole in the door. He saw Cameron pick up the packets, and drop them behind the couch. Cameron opened the door; while one officer remained with Cameron, Perrone searched and found packets of cocaine under the floor boards.

Cameron moved to suppress the evidence, claiming that a search warrant should have been obtained. At the hearing on the motion to suppress, the Commonwealth put on testimony of only one witness, Sergeant Michael Perrone, who had conducted the search and made the arrest. Perrone testified that he had arrested another individual in the house the day before the search in question here, and so was familiar with the property. He described the house as an abandoned rowhouse on Ruby Street in West Philadelphia:

> There are two doors to the left and there is a door to the right. The door to the left, the outer door leads to a vestibule area. Then there is another door. This door leads to a room. This room is approximately 12 feet by 15 feet, and the room is sealed from what was the kitchen area of this property.
>
> There is still an old sink and old range and some cabinets were in the back area.... There is no running water, but debris, trash thrown all over the place.
>
> This one room is sealed off entirely from any other part of the property. To get to the kitchen area, or what was

the kitchen area, you have to go out. There is no rear door and the steps were dilapidated.

*　*　*　*　*　*

The door to the right goes to what was probably a second floor. That apartment was littered with human waste and trash and other debris. The window at one time had glass in it, was plywooded over [on both the first and second floors].

Perrone stated that there were no bathroom facilities, or cooking appliances in the room, and that there was no running water or electricity. He testified that he knew no one lived in the house, and that Cameron gave his address as 535 North Roger Street. He also testified, however, that the room in which he arrested Cameron contained a couch, a table, and a television set, which was on both at the time of the arrest and on the previous day. Perrone stated that when he peered through the hole in the door, he observed an "aluminum type foil platter" on the table with food on it.

The suppression court granted the motion to suppress, holding that the presence of food, a couch, and a television set in the room indicated that the house had some of the attributes of a dwelling place, and therefore Cameron had a reasonable expectation of privacy there. The Commonwealth then appealed to this court, arguing firstly, that a person has no legitimate expectation of privacy in an abandoned and uninhabitable house, and secondly, in response to an argument made by Cameron, that the automatic standing rule [1] does not create a constitutionally protected area

---

**1.** The automatic standing rule recognizes the standing of an accused to challenge a search and seizure where possession of the seized evidence at the time of the search and seizure is an essential element of the offense in question. *Commonwealth v. Peterkin,* 511 Pa. 299, 309–310, 513 A.2d 373, 378 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987). In order to establish standing, the accused must establish one of the four following personal interests:

(1) his or her presence on the premises at the time of the search and seizure;

(2) a possessory interest in the evidence improperly seized;

(3) that the offense charged included as an essential element possession at the time of the contested search and seizure; or

(4) a proprietary or possessory interest in the premises.

*Id.*

when the factual situation involves an uninhabited and abandoned house used to operate an illegal narcotics operation.

In reviewing a suppression court's order to suppress evidence, we, as the reviewing court, are bound by that court's findings of fact, unless we determine that those findings of fact are not supported by the record. *Commonwealth v. White*, 358 Pa.Super. 120, 123, 516 A.2d 1211, 1212 (1986). We must also determine the legitimacy of the inferences and legal conclusions drawn from those findings of fact. *Commonwealth v. Reddix*, 355 Pa.Super. 514, 518, 513 A.2d 1041, 1042 (1986). In reaching our determination, we must consider only the evidence of the defendant's witnesses, and only so much of the evidence presented by the prosecution as remains uncontradicted by the record as a whole. *Commonwealth v. Hamlin*, 503 Pa. 210, 215–16, 469 A.2d 137, 139 (1983).[2] When the evidence supports the factual findings of the suppression court, we may only reverse if there is an error of law. *Reddix*, 355 Pa.Super. at 518, 513 A.2d at 1042. In this case, the defendant/appellee, Clifton Cameron, put on no witnesses. Therefore, the Commonwealth's evidence remains uncontradicted in the record. Because there is no question that the factual findings are supported by the record, we will address ourselves to the validity of the court's inferences and legal conclusions.

■ The Commonwealth claims that under both the federal constitution and the constitution of this Commonwealth, an individual has no right of privacy in a vacant house. We will first analyze the question under the fourth amendment to the federal constitution. The fourth amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and sei-

2. The Commonwealth in its brief cites to us the standard of review of a suppression order when the defendant has appealed. In this case, the court granted the suppression order, and the Commonwealth has appealed, necessitating a somewhat different standard. *See Hamlin*, 503 Pa. at 215–216, 469 A.2d at 139.

zures." U.S. Const. amend. IV. In analyzing this question, a court must determine first whether a search within the meaning of the fourth amendment has taken place by determining whether the person who claims protection has a legitimate expectation of privacy in the invaded place. *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 430, 58 L.Ed.2d 387 (1978). The individual must exhibit a subjective expectation of privacy in the invaded place, and society must be prepared to recognize that expectation as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (citing *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring)). It is only when this legitimate expectation of privacy exists that a search within the meaning of the fourth amendment has occurred. *Maryland v. Macon*, 472 U.S. 463, 469, 105 S.Ct. 2778, 2782, 86 L.Ed.2d 370 (1985). *Accord Commonwealth v. Lemanski*, 365 Pa. Super. 332, 345, 529 A.2d 1085, 1091 (1987).

In the instant case, it seems clear that under federal law, Cameron manifested a subjective expectation of privacy. However, it cannot be said that his expectation of privacy is one that society is prepared to accept as reasonable. The Supreme Court has intimated that the question of what is reasonable is inextricably intertwined with the question of whether an individual has an expectation of privacy rooted in a source outside the fourth amendment:

Legitimate expectations of privacy by law must have a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. One of the main rights attaching to property is the right to exclude others ... and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude. Expectations of privacy protected by the Fourth Amendment ... need not be based on a common-law interest in real or personal property, or on the invasion of such an interest.... But by focusing on

legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned the use of property concepts in determining the presence or absence of the privacy interests protected....

*Rakas*, 439 U.S. at 143 n. 12, 99 S.Ct. at 430 n. 12. *See also Lemanski*, 365 Pa.Super. at 346, 529 A.2d at 1091 (1987); *Commonwealth v. Lowrey*, 305 Pa.Super. 66, 71, 451 A.2d 245, 247 (1982).

Although the property interest involved need not amount to an ownership interest, there must be some legal or de facto right to control the area in question. Considering the record in the instant case, there is no evidence to indicate that Cameron had any legal or de facto right to control the house. The testimony of Sergeant Perrone indicated that the house was abandoned, and, although there was some evidence to show that Cameron was "squatting" there, the record contains no facts which would lead us to believe that he had any rights as against the owner, or as against any other person who attempted to enter the house. He therefore could not expect to exclude any other person who attempted to enter. We find that under federal law, Cameron had no reasonable expectation of privacy in an abandoned house.

■ This does not end the analysis, however. We must determine what Cameron's rights are under Pennsylvania constitutional law. Article I, section 8 of the Pennsylvania Constitution also provides that an individual will be secure in his or her "persons, houses, papers and possessions from unreasonable searches and seizures." Art. I, sec. 8. The courts of this Commonwealth have seen fit to extend constitutional rights under the Pennsylvania Constitution where the Supreme Court of the United States has been more restrictive. *See, e.g., Commonwealth v. Sell*, 504 Pa. 46, 470 A.2d 457 (1983) (disapproving the Supreme Court's abrogation of the automatic standing rule, and holding that the concept of automatic standing is still viable in Pennsyl-

vania) [3]; *Commonwealth v. DeJohn,* 486 Pa. 32, 49, 403 A.2d 1283, 1289 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980) (disapproving Supreme Court's determination that depositor had no legitimate expectation of privacy in bank records, and holding to the contrary under Pennsylvania Constitution); *Commonwealth v. Beauford,* 327 Pa.Super. 253, 475 A.2d 783 (1984), *appeal dismissed,* 508 Pa. 319, 496 A.2d 1143 (1985), (disapproving the Supreme Court's determination that individual had no expectation of privacy in numbers dialed, and holding pen registers constituted unreasonable search). [4] This authority may indicate that what society is willing to consider as reasonable has a broader compass under Pennsylvania law than under the fourth amendment. Consideration of the history of protection against unreasonable searches and seizures in Pennsylvania, however, leads us to the conclusion that under the Pennsylvania Constitution, as well as under the Constitution of the United States, it is unreasonable to expect that one has a privacy interest in an abandoned structure which is not one's dwelling place.

Although the home has always been as sacrosanct in search and seizure jurisprudence in this Commonwealth as under the fourth amendment, the same considerations which create those privacy concerns are not necessarily present when one is discussing not a home, but a mere structure. [5] *See In re Eckert,* 260 Pa.Super. 161, 167, 393

3. Although our supreme court in *Sell* saw fit to retain automatic standing in Pennsylvania jurisprudence, and although in doing so, it questioned the concept of "legitimate expectation of privacy," as discussed in *Rakas,* in the context of the standing analysis, *see Sell,* 504 Pa. at 59–62, 65–67, 470 A.2d at 464–466, 468, this does not render irrelevant to our analysis under Article I, section 8 the inquiry of whether a reasonable expectation of privacy existed, as Cameron argues. *Sell* gives Cameron the ability to raise his search and seizure issue. Once he makes his argument, the court must then determine whether or not the search was unreasonable in the context of the merits of his claim.

4. The supreme court discussed *Beauford* with approval in the recent decision of *Commonwealth v. Melilli,* 521 Pa. 405, 555 A.2d 1254 (1989).

5. As this court stated in *Lemanski,* the fourth amendment reflects the recognition of the Founders that "certain enclaves should be free from

A.2d 1201, 1204 (1978) (police did not need a warrant to enter a vacant house). *Cf. Commonwealth v. Coyle,* 415 Pa. 379, 397, 203 A.2d 782, 791 (1964) (constitutional safeguard against searches and seizures has reference to place of occupancy not vacated premises). *Accord United States v. Thomas,* 216 F.Supp. 942 (N.D.Cal.1963) (although protection of fourth amendment extends to periods of vacancy, where house had indefinitely been abandoned as a dwelling place and was being used solely as shelter for a still, the court found no fourth amendment protection available); *cf. Kelley v. State,* 146 Ga.App. 179, 245 S.E.2d 872 (1978) (court found protection against unreasonable searches and seizures applied to a tent which had attributes of a dwelling

arbitrary government interference...." *Lemanski,* 365 Pa.Super. at 347, 529 A.2d at 1092 (quoting *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 1741, 80 L.Ed.2d 214 (1984)). The courts of this Commonwealth, as well as the Supreme Court of the United States, have "stressed 'the overriding respect for the sanctity of the home that has been imbedded in our traditions since the origins of the Republic.' [*id.*] ... The Fourth Amendment reflects a choice that our society should be one in which citizens 'dwell in reasonable security and freedom from surveillance.' " *Id.* (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)). As the Supreme Court stated in *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958):

> [T]he precious interest of privacy [is] summed up in the ancient adage that a man's house is his castle.... Remarks attributed to William Pitt, Earl of Chatham, on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle:
>
> The poorest man may in his cottage bid defiance to the crown. It may be frail; its roof may shake, the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!

*Id.* at 307, 78 S.Ct. at 1194–95.

As these quotations indicate, the Supreme Court, and the courts of this Commonwealth, have always interpreted the concern of the Founders to lie initially within the dwelling places of the citizens of this country and Commonwealth. This does not mean that the rights accorded to the individual within his or her home cannot be extended to other areas; as the Katz Court's often quoted expression puts it, the fourth amendment protects people, not places. *See Katz,* 389 U.S. at 351, 88 S.Ct. at 511. However, this focus militates against embuing with the sanctity of the home a structure which has no apparent connection to the individual's basic right to be secure within his or her dwelling place.

place even though it was set up on land which did not belong to the individuals claiming protection).

In this case, the Commonwealth offered evidence that officers had been to the same place the day before Cameron was arrested, and that they had been through the entire house. Sergeant Perrone stated that the second floor was littered with trash and excrement, that the windows were broken out and boarded over, and that the utilities were turned off. He further stated that he had arrested other individuals at the house the day before. Cameron was not there at that time, and when questioned after his arrest, gave another address as his home. Under the facts presented, Cameron had no right to enter the house, and had no right to exclude others from entering.

Cameron attempts to play on the conscience of the court by arguing that such a decision would be based in a "middle class" definition of a dwelling place. We disagree. We do not decide whether in other circumstances a vacant structure might be considered to be a "dwelling place" within the purview of article I, section 8. We merely find that under the facts of this case, a television, a couch, and a platter of food are insufficient attributes of a home, and so failed to call the protection against unreasonable searches and seizures into play. We see no reason to extend the protection against unreasonable searches and seizures to such a situation. We hold, therefore, that the trial court erred in finding that Cameron had a reasonable expectation of privacy in the house in question.

Reversed and remanded for proceedings not inconsistent with this memorandum. Jurisdiction is relinquished.