CIRILLO, Judge.
 

 Larry Robbins appeals from the judgment of sentence entered in the Court of Common Pleas of Delaware County. We affirm.
 

 In June of 1990, an informant provided Officer James Reif of Upper Darby Township Police Department with information that a front-end loader and other stolen items were located on property owned by Larry Robbins. The informant also provided directions to Robbins’ home and described the home as being secluded in a wooded area.
 

 The description of the stolen items provided by the informant matched descriptions listed in an Upper Darby police report. The directions given by the informant to Robbins’ home were corroborated by a West Goshen Township detective and a postmaster. The informant’s information was further corroborated by two helicopter fly-overs from which items matching the informant’s descriptions were viewed.
 

 The helicopter fly-overs were conducted and photographs were taken at an altitude of approximately 500 feet. Based on their observations from the helicopter, the police obtained and
 
 *179
 
 executed a search warrant. While the police were on Robbins’ property, they viewed the front-end loader and trailer and seized these items. Robbins was arrested and charged with receiving stolen property.
 

 Robbins filed a pre-trial motion to suppress all physical evidence found and seized, and any statements or admissions made by Robbins. In this motion, Robbins argued that the visual intrusion by the police from the helicopter constituted an illegal search and, thus, the evidence seized and the statements made by Robbins were inadmissible because they were “fruit of the poisonous tree.”
 
 [1]
 

 A suppression hearing was held and the court considered the following testimony. Appellant’s wife stated that the helicopter was approximately 90 feet above the ground and 100 feet from the rear of her home. She further testified that the noise created by the helicopter was extremely loud, caused her fear, and caused her children and dog to run all over the house.
 

 Troopers Perone and Weidner conducted the aerial surveillance of the premises. At the hearing, Trooper Perone estimated the altitude of the helicopter was 500-600 feet above the ground, was always well above the tree-tops on the first flight, and 300 feet above the tree-tops on the second flight. Trooper Perone estimated that the lowest altitude flown was 500 feet. Trooper Weidner indicated that he routinely flies at 500-800 feet and had no recollection of being asked to fly at a lower level on this occasion. Elizabeth Flynn, who was admitted as an expert in the field of aerial photography, opined that the photographs were taken by a 35mm camera with a standard lens from an estimated altitude of 300 feet. However, her margin of error in estimation was 100-150 feet.
 

 After reviewing the evidence, the suppression court assessed the credibility of the witnesses and found that the aerial surveillance was at an altitude of approximately 500 feet
 
 *180
 
 and posed no hazard to persons or property on the ground. Accordingly, Robbins’ motion to suppress was denied. On November 23, 1992, a jury found Robbins guilty of two counts of receiving stolen property.
 
 [2]
 
 Post-verdict motions were filed and denied and Robbins was sentenced to concurrent terms of eight to twenty-four months less one day on the convictions. This appeal followed.
 

 Robbins raises the following issues for our review:
 

 (1) Whether the Commonwealth presented evidence sufficient to convict Appellant?
 

 (2) Whether the state police’s use of a helicopter to corroborate an informant’s information violated Appellant’s rights under either the Fourth Amendment of the Federal Constitution or Article I, Section 8 of the State Constitution?
 

 Robbins first argues that there was insufficient evidence presented to convict him for receiving stolen property. In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each .and every element of the crimes charged was established beyond a reasonable doubt.
 
 Commonwealth v. Jarman,
 
 529 Pa. 92, 94-95, 601 A.2d 1229, 1230 (1992);
 
 Commonwealth v. Swann,
 
 431 Pa.Super. 125, 635 A.2d 1103 (1994). “This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt.”
 
 Commonwealth v. Swerdlow,
 
 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994) (citing
 
 Commonwealth v. Hardcastle,
 
 519 Pa. 236, 246, 546 A.2d 1101, 1105 (1988)). Furthermore, it matters not whether the appellant finds a witness’s testimony lacking in credibility; such matters are solely within the province of the jury as trier of fact and, as such, will not be assailed on review by this court.
 
 Id.
 

 The crime of receiving stolen property is defined as:
 
 *181
 
 § 3925. Receiving Stolen Property.
 

 (a) Offense defined. — A person is guilty of theft if he intentionally receives, retains, or disposes of movable property of another knowing that it has been stolen, or believing that it has probably been stolen, unless the property is received, retained, or disposed with intent to restore it to the owner.
 

 (b) Definition — As used in this section the word “receiving” means acquiring possession, control or title, or lending on the security of the property.
 

 18 Pa.C.S.A. § 3925. Therefore, to obtain a conviction for receiving stolen property the Commonwealth must establish beyond a reasonable doubt that the defendant knew or should have known that the property was stolen.
 
 Commonwealth v. Grekis,
 
 411 Pa.Super. 494, 601 A.2d. 1275 (1992).
 

 The evidence, when viewed in the light most favorable to the Commonwealth, discloses the following: Robbins was found in possession of the front-end loader and the trailer on June 7,1990,12 days after it should have been returned to the lawful owner, Modern Equipment Rental. Robbins, along with Frank Brown, his wife’s nephew, and Richard Gambetta, Brown’s friend, discussed procuring the above-mentioned equipment. According to Gambetta, Brown claimed to be able to get Robbins a discount because he was associated with M & M Landscaping, and offered to get the front-end loader for $1,000.00 for one month. M
 
 &
 
 M Landscaping regularly did business with Modern Equipment Rentals, the owner of the property. Gambetta further testified that Robbins gave Brown $1,000.00 and that Brown and he (Gambetta) went to Modern Equipment, where Brown signed a piece of paper and picked up the equipment. Brown then returned the equipment and the paper he had signed to Robbins. The signature on the paper was that of one Steve Becker, allegedly on behalf of M & M Landscaping. No one named Steve Becker has ever worked at M & M Landscaping. The property according to the rental agreement, was due back on May 26, 1990, and was rented for an amount in excess of $1,500.00, almost twice the amount Robbins had allegedly given Brown. Robbins did have a copy of this rental contract.
 

 
 *182
 
 At trial, Robbins’ wife testified that Brown, who was supposedly working for M & M Landscaping at that time, would come by to help Robbins with work on his house “often” in an average week. At the time of the trial, Brown had not been seen or heard from for at least a year.
 

 The reasonable inference to be derived from these facts is that Robbins either knew or should have known that the property was stolen. Even if the jury believed that Robbins had paid Brown $1,000.00, Robbins was in possession of a receipt which named Steve Becker (not Frank Brown) as the renter, which required that the equipment be returned in three weeks (not a month), and which listed a rental price of almost twice what Robbins allegedly paid. Robbins retained the equipment well past the return date as listed on the agreement, and a week beyond the period for which he allegedly thought he had rented it. Additionally, given the fact that Brown “often” was at Robbins’ house helping out, the jury could infer that Robbins knew that Brown was not working for M & M Landscaping. Furthermore, Gambetta, who was involved in procuring the property, implicated Robbins, but never mentioned Brown.
 

 All of this evidence, considered in the light most favorable to the Commonwealth, established beyond a reasonable doubt that Robbins possessed the equipment under circumstances which permitted the jury to infer that he either knew or believed that the property was or probably had been stolen.
 
 Grekis, supra.
 
 Accordingly, Robbins’ sufficiency of the evidence claim is without merit.
 

 Robbins next argues that in flying over his property in a helicopter and in making aerial observations therefrom, the police violated his rights under the Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution. We disagree.
 

 Robbins’ house is located down a long driveway off of Green Lane in Upper Darby Township. The house is in the center of a wooded area and is secluded from the street by trees. Based on the observations made by the police from a helicop
 
 *183
 
 ter, a search warrant was issued. Robbins contends the trial court erred in denying his motion to suppress the front-end loader seized pursuant to the warrant. He claims that the use of the helicopter by the police, prior to issuance of the warrant, was conducted in a hazardous fashion, and constituted a search in violation of the Fourth Amendment. Robbins claims, therefore, that the evidence seized pursuant to the warrant should have been suppressed as “fruit of the poisonous tree.”
 
 Wong Sun v. United States,
 
 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963);
 
 Commonwealth v. Whitaker,
 
 461 Pa. 407, 336 A.2d 603 (1975).
 

 In reviewing a claimed error of the suppression court in denying a defendant’s motion to suppress, we will consider only the prosecution’s evidence and so much of the defendant’s evidence as remains uncontradicted. It is, however, exclusively in the province of the suppression court to determine the credibility of the witnesses and the weight to be accorded their testimony.
 
 See Commonwealth v. Brinkley,
 
 423 Pa.Super. 289, 620 A.2d 1226 (1993);
 
 Commonwealth v. Neely,
 
 298 Pa.Super. 328, 444 A.2d 1199 (1982).
 

 Our task, therefore, is to determine whether the record supports the factual findings of the suppression court, and to determine the reasonableness of the inferences and legal conclusions drawn therefrom.
 
 Commonwealth v. Lemanski,
 
 365 Pa.Super. 332, 529 A.2d 1085 (1987). Appellant does not dispute the suppression court’s findings of fact. Therefore, we need only to determine the reasonableness of the court’s inferences and legal conclusions.
 

 The Fourth Amendment protects: “The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.... ” U.S. Const, amend. IV. “The basic purpose of this amendment ... is to safeguard the privacy and security of individuals against arbitrary invasion by government officials.”
 
 Camara v. Municipal Court,
 
 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967). Therefore, warrants are generally required before a governmental agency or official may conduct a
 
 *184
 
 search.
 
 See United States v. Karo,
 
 468 U.S. 705, 714-15, 104 S.Ct. 3296, 3302-03, 82 L.Ed.2d 530 (1984) (stating that warrantless searches are presumptively unreasonable). The threshold question, therefore, in any Fourth Amendment inquiry is whether the conduct of the police amounted to a search. A search occurs when the government intrudes on an area where a person has a “constitutionally protected reasonable expectation of privacy.”
 
 Katz v. United States,
 
 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (Harlan, J., concurring).
 
 See California v. Ciraolo,
 
 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986).
 

 In the seminal case of
 
 Katz v. United States,
 
 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the United States Supreme Court set forth a two prong test to determine whether a search occurred: 1) whether a person exhibited an actual expectation of privacy; and 2) whether such an expectation was one that society is prepared to recognize as reasonable.
 
 [3]
 
 These two elements are known as the subjective and objective tests.
 

 Historically, courts pay little attention to the subjective prong of the
 
 Katz
 
 test.
 
 See
 
 1 Wayne R. LaFave,
 
 Search and Seizures
 
 § 2.1(c) at 309 (2d ed. 1987). Most courts readily find that a subjective expectation of privacy exists and focus instead on the second prong; that is, whether society is willing to recognize that expectation of privacy as reasonable.
 
 Id.
 
 In making this determination, we are instructed to look at the facts and circumstances of each case. Examples of the application of the objective prong of the
 
 Katz
 
 test are legion.
 
 Compare Commonwealth v. Peterson,
 
 535 Pa. 492, 636 A.2d 615 (1993) (holding that defendant had no reasonable expectation of privacy while within an abandoned storefront);
 
 Commonwealth v. Perdue,
 
 387 Pa.Super. 473, 564 A.2d 489 (1989) (holding that defendant did not have a reasonable expectation of privacy in garbage left under the porch of church parson
 
 *185
 
 age);
 
 Commonwealth v. Cameron,
 
 385 Pa.Super. 492, 561 A.2d 783 (1989) (finding that the defendant had no reasonable expectation of privacy within an abandoned house in which he had no ownership interest);
 
 Commonwealth v. Carelli,
 
 377 Pa.Super. 117, 546 A.2d 1185 (1988) (holding that the defendant did not have a reasonable expectation of privacy in his garage because it was an area of common access);
 
 Commonwealth v. Lowery,
 
 305 Pa.Super. 66, 451 A.2d 245 (1982) (holding that defendant did not have a reasonable expectation of privacy in his room because he did not manifest an intent to exclude others)
 
 with Commonwealth v. Brundidge,
 
 533 Pa. 167, 620 A.2d 1115 (1993) (finding that an individual does have a reasonable expectation in closed containers left in motel room after check out);
 
 Commonwealth v. Lemanski,
 
 365 Pa.Super. 332, 529 A.2d 1085 (1987) (holding that defendant had a reasonable expectation of privacy in his sunroom/greenhouse from police peering through shrubbery using specially equipped binoculars).
 

 While most Fourth Amendment cases involve privacy interests of which there is voluminous authority to look to for guidance, cases involving aerial surveillance are decidedly more infrequent and, thus, more difficult to decipher. The information that police may obtain through aerial observation is virtually unlimited. Aerial searches open up all of a suspect’s outdoor property for police observation. A police officer scanning a suspect’s land may no more limit his survey to unlawful activity than police listening to a wiretap can limit their review to a suspect’s incriminating conversations. Furthermore, police are not required to focus on any particular suspect. Police may survey entire cities or neighborhoods falling within the officer’s field of vision. For these reasons, aerial surveillance cases are more difficult in determining whether a person has a reasonable expectation of privacy. David E. Steinberg,
 
 Making Sense of Sense-Enhanced Searches,
 
 74 Minn.L.Rev. 563 (1990).
 

 There are two basic types of aircraft surveillance cases: 1) fixed wing; and 2) helicopter. In
 
 Ciraolo,
 
 a fixed wing surveillance case, the Supreme Court of the United States
 
 *186
 
 held that if the police are where they have a right to be and view activity that is clear and visible, such actions do not amount to searches and do not, therefore, trigger protections afforded by the Fourth Amendment. The facts in
 
 Ciraolo
 
 revealed that the police were acting on an anonymous tip that Ciraolo was growing marihuana in his backyard. Because Ciraolo’s backyard was surrounded by a 6 foot outer fence and a 10 foot inner fence, the police were unable to observe the contents of his backyard from ground level. The police then flew a plane over Ciraolo’s house at an altitude of 1,000 feet— within “navigable airspace.”
 
 [4]
 
 The Court concluded that because the police were viewing what any member of the public could view flying in the airspace above Ciraolo’s yard, or a telephone repairman on a pole overlooking the yard, that there was no search and, thus, no Fourth Amendment violation.
 
 Ciraolo,
 
 476 U.S. at 215, 106 S.Ct. at 1813. Thus, the Supreme Court’s holding in
 
 Ciraolo
 
 allows the police, traveling in a fixed wing aircraft in public airspace, to view anything clear and visible without triggering one’s Fourth Amendment rights.
 

 Unlike fixed wing aircraft which have determinate altitude requirements and a certain degree of inflexibility of flight, helicopters have no FAA imposed altitude restrictions and are uniquely capable of precision flight. In fact, the differences between fixed wing aircraft and helicopters are myriad. The FAA regulations provide that helicopters may be operated at less than the minimum height for fixed wing aircraft “if the operation is conducted without hazards to persons or property on the surface. In addition, each person operating a helicopter shall comply with routes or altitudes specifically prescribed for helicopters by the FAA administrator.” 14 C.F.R. § 91.79 (1988). Furthermore, a helicopter has many unique capabilities of which a fixed wing aircraft is lacking. Helicopters can hover over a fixed position for long periods of time, they can
 
 *187
 
 change their altitude and direction of flight at any time, and they are capable of landing in relatively tight quarters.
 

 With its singular abilities, the helicopter can readily become an aerial viewing platform, reaping great benefits to law enforcement. These differences between helicopters and fixed wing aircraft, however, unwittingly ensure that the determination of whether helicopter surveillance triggers the protections afforded by the Fourth Amendment is more difficult than in fixed wing aircraft surveillance situations. The United States Supreme Court addressed these difficulties in
 
 Florida v. Riley,
 
 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1988).
 

 In
 
 Riley,
 
 the Supreme Court had pause to determine if an individual had a reasonable expectation of privacy, which prevented the police from observing his or her backyard from a helicopter flying at 400 feet. The defendant in
 
 Riley
 
 lived in a mobile home located on five acres of property. Near the home was a greenhouse that was obscured from view by a fence, trees, and shrubs. The contents of the greenhouse, however, were visible from above because two panels of the roof were missing. As the result of an anonymous tip, a police helicopter made two passes over the property at an altitude of 400 feet. The officer viewed with his naked eyes what he thought was marijuana growing in the greenhouse. Based on the police officer’s observations and the anonymous tip, a search warrant was obtained and executed, and marijuana was found and seized. The Court held that the actions of the police officer did not constitute a search within the meaning of the Fourth Amendment.
 
 Id.
 
 at 450, 109 S.Ct. at 696.
 

 In a plurality decision, the Court considered the total atmosphere of the case in holding that Riley’s expectation of privacy was unreasonable. Recognizing a helicopter’s unique capabilities and the fact that the FAA allows helicopters to fly at any altitude, albeit not in a hazardous manner, the Court, in making its Fourth Amendment analysis, considered a wide variety of factors, including whether the helicopter was flying hazardously at the time of the surveillance. Specifically, the Court reached the following conclusions: (1) the helicopter
 
 *188
 
 was not flying contrary to regulations or law;
 
 [5]
 
 (2) there was no evidence presented that helicopter flights at 400 feet were sufficiently rare to support Riley’s claim of a reasonable expectation of privacy; (3) the helicopter did not interfere with Riley’s normal use of the greenhouse or of other parts of the curtilage; (4) no intimate details connected with the use of the home or curtilage were observed; and (5) there was no undue noise, wind, dust, or threat of injury.
 
 Riley,
 
 488 U.S. 445, 452, 109 S.Ct. 693, 697 (1988);
 
 see also
 
 Daniel R. Hansen,
 
 Warrantless Aerial Surveillance and Florida v. Riley: The Loss of Liberty,
 
 1990 Utah L.Rev. 407 (1990). Because of the above findings, the Court held that the observation of Riley’s backyard did not constitute a search and, therefore, did not trigger the protections of the Fourth Amendment.
 

 In
 
 Commonwealth v. Oglialoro,
 
 525 Pa. 250, 579 A.2d 1288 (1990), the Pennsylvania Supreme Court also had the opportunity to determine the constitutionality of a helicopter surveillance. In
 
 Oglialoro,
 
 the police received an anonymous tip that Oglialoro was growing marijuana in his barn. The police, in an attempt to corroborate the information, hovered over Oglialoro’s barn at an altitude of 50 feet for approximately 15 seconds and made a total of three or more passes over the property, lasting approximately five minutes. Oglialoro’s wife was present in the home at the time of the fly-overs. She testified that she experienced various sensations caused by the helicopter’s proximity, such as loud noise, and vibration of the house and windows.
 
 Id.
 
 at 254, 579 A.2d at 1292.
 

 The
 
 Oglialoro
 
 Court applied many of the factors set forth by the United States Supreme Court in
 
 Riley. Id.
 
 at 261, 579 A.2d at 1294. First, the Court inquired whether the helicop
 
 *189
 
 ter was flying contrary to law or regulation. In so doing, the Court looked to the FAA’s regulations that permit helicopters to fly anywhere provided not in a hazardous manner. 14 C.F.R. § 91.79(d). While the Court did not consider the FAA regulations as defining the reach of the Fourth Amendment, they did see the regulations as a reference designed to protect people on the ground.
 
 Oglialoro,
 
 525 Pa. at 262, 579 A.2d at 1295. Consequently, the Court, referring to the FAA regulations, addressed the question whether the helicopter was operated in a hazardous manner.
 

 The Court held that the helicopter flying at 50 feet “above” Oglialoro’s property, hovering for fifteen seconds, and then making three passes over a five minute period, coupled with Oglialoro’s wife’s unrebutted testimony of the undo noise, wind, and vibration was sufficient evidence to endanger people or property on the ground. Because the police operation of the helicopter was egregiously hazardous, the Court found that this, alone, was enough to find the conduct of the police unreasonable and therefore suppressed the evidence. Our learned Justices unambiguously stated:
 

 We believe that such evidence is sufficient to establish that the helicopter’s presence at 50 feet above the barn represented a hazard to persons and property on the ground and that the conduct of the police in flying at this level was unreasonable. We perceive in the testimony of the wife that the surveillance was, in fact, intrusive and that flying the helicopter at this low level created a risk of harm to her and her property during the search.
 

 Id.
 
 at 262, 579 A.2d at 1295.
 

 In essence, therefore, in determining whether helicopter surveillance in
 
 Oglialoro
 
 amounted to a search protected by the Fourth Amendment, the Court applied a traditional
 
 Katz
 
 analysis; that is, whether Oglialoro’s expectation of privacy is one that society is willing to accept as reasonable. In making this determination, the Court looked to the totality of the circumstances surrounding the surveillance and considered
 
 *190
 
 such factors as: whether the helicopter was flown in a hazardous fashion; whether there was undue noise, wind, dust, or threat of injury; the altitude at which the helicopter was flown; the amount of time the helicopter hovered over the property; the overall time the police surveyed the property; and the relative frequency that helicopters normally fly over the region.
 
 Oglialoro,
 
 525 Pa. at 261, 579 A.2d at 1294 (1990) (citing
 
 Florida v. Riley,
 
 488 U.S. at 451, 109 S.Ct. at 697, 102 L.Ed.2d 835 (1989)).
 

 A number of jurisdictions have considered additional factors in evaluating whether an individual has an objectively reasonable expectation of privacy from aerial observation. These factors include: the time of day, the height of the helicopter and whether it interfered with the individuals use of his property, the character of the area (or object) which was the subject of the surveillance, whether the observation revealed intimate details connected with the use of his home or curtilage, and whether the police had a right to be where they were.
 
 Henderson v. People,
 
 879 P.2d 383 (Colo.1994);
 
 Commonwealth v. One 1985 Ford Thunderbird Auto,
 
 416 Mass. 603, 624 N.E.2d 547 (1993);
 
 People v. McKim,
 
 214 Cal.App.3d 766, 263 Cal.Rptr. 21 (1989).
 

 In the case at hand, after looking at the totality of the circumstances surrounding this case and applying the factors as set forth in
 
 Riley
 
 and adopted by
 
 Oglialoro,
 
 we find that the police use of the helicopter did not violate an expectation of privacy “that society is prepared to recognize as reasonable.”
 
 Katz,
 
 389 U.S. at 361, 88 S.Ct. at 516 (1967) (Harlan, J., concurring).
 

 First, unlike
 
 Oglialoro,
 
 where the police were at an altitude of 50 feet and made three passes over the property over a five minute period, the helicopter in the instant case never flew below 500 feet and never flew over Robbin’s property. On the contrary, according to the trial court’s findings, the helicopter flew at an altitude of 500 feet and was not operated in a hazardous fashion. Therefore, according to the FAA regula
 
 *191
 
 tions, the helicopter was in navigable airspace, 14 C.F.R. § 91.79(c), and was operated lawfully. 14 C.F.R. § 91.79(d).
 

 Second, Robbins did not present any evidence that helicopters flying at 500 feet were sufficiently rare in his area to support his claim of a reasonable expectation of privacy. In an age where private and commercial flight in the public airways is routine, it is unreasonable for Robbins to expect that something the size of a front-end loader was constitutionally protected from being observed with the naked eye from an altitude of 500 feet. Because there is considerable public use of airspace at altitudes of 500 feet and above, and because Robbins introduced no evidence to the contrary, Robbins’ expectation that his curtilage was protected from naked eye aerial observation from that altitude was not a reasonable one.
 

 Additionally, the observation did not interfere with Robbins’ use of his property and posed only a very limited degree of intrusiveness. The helicopter made only two passes over Robbins’ property over a course of a few minutes and never passed below an altitude of 500 feet. Furthermore, there were no intimate details observed, and there was no credible evidence of undue noise, wind, dust, or threat of injury. Thus, after thorough scrutiny of all the facts and circumstances of this case and application of the above factors, we find that the operation of the helicopter was not a search and, as such, did not trigger Robbins’ Fourth Amendment rights.
 

 The judgment of sentence is hereby affirmed.
 

 [1]
 

 . This doctrine requires the suppression of all evidence derived from the government’s violation of an individual’s rights under the Fourth Amendment.
 
 Wong Sun v. United States,
 
 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).
 

 [2]
 

 . 18 Pa.C.S.A. § 3925(a).
 

 [3]
 

 . The
 
 Katz
 
 test has long been employed by this Commonwealth as the standard in Fourth Amendment cases.
 
 See, Commonwealth ex rel. v. Rundle,
 
 432 Pa. 466, 470, 248 A.2d 197 (1968);
 
 Commonwealth v. Lemanski,
 
 365 Pa.Super. 332, 529 A.2d 1085 (1987).
 

 [4]
 

 . "Navigable airspace” is defined as that altitude above the minimum prescribed by the Civil Aeronautics Board. 49 U.S.C.A.App. § 1301(29).
 

 [5]
 

 . The Court recognized that helicopters may be operated at less than the mínimums for fixed-wing aircraft "if the operation is conducted without hazard to persons or property on the surface.” 14 C.F.R. § 91.79 (1988). However, the Court did not specifically state its reasoning why they found the helicopter was not operated in a hazardous manner. Because the Court stated that the helicopter did not interfere with Riley’s use of his land and did not cause any undo noise, wind, or threat of injury, this implies that the Court weighed these factors in determining that the helicopter was not operated in a hazardous manner.