J-S76001-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| FREDERICK C. HARRIS, III, | |
| Appellant | No. 449 WDA 2017 |

Appeal from the Judgment of Sentence Entered February 14, 2017
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0008659-2015

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and MURRAY, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED JULY 26, 2019**

Appellant, Frederick C. Harris, III, appeals from the judgment of sentence of an aggregate term of life imprisonment without parole, imposed following his conviction for two counts of first-degree murder and two counts of abuse of a corpse. Appellant challenges the trial court's admitting into evidence ten autopsy photographs of the victims' bodies, as well as the court's denying his motion to suppress evidence. After careful review, we affirm.

Appellant was arrested for the murders of his mother, Olivia Gilbert, and her husband (Appellant's stepfather), Lamar Gilbert. The trial court summarized the facts adduced at trial as follows:

> Angela Joanne Harris, [Appellant's sister], testified that she and her mother[, Olivia Gilbert,] had a very good relationship and talked … every day, so when she had not heard from her mother in three days…, she called the Penn Hills police for a wellness check on December 1[6, 2014]. She stated that … Appellant had

been living with her father, and her mother had told her that she would not allow … Appellant to move back into [the Gilberts'] home.  She testified that she was told that the police could not enter the home unless someone let them in.  Harris kicked the door in, and the police entered the home.  She testified that the police showed her a piece of paper at some point that appeared to be a note from her mother to … Appellant[,] which stated[:] "Hello Fred.  Thanks for housesitting and fixing up the place while we are on vacation.  See you soon.  Tell everyone hello.  Mr. and Mrs. Gilbert Lamar. [*sic*]  P.S.: Don't open the door for anyone." Harris testified that the note was in … Appellant's handwriting. She also testified that she had some mental health problems and a history of strangling cats when she was not taking her medication, but she had been taking her medication at the time of her mother and stepfather's deaths and she had not hurt her mother and stepfather.

Frederick C. Harris, Jr., the father of … Appellant, testified that … Appellant lived with him for over a year and took care of him after he had surgery, but because of the bickering, eventually … Appellant was going to move out and get his own place.  He also noted that … Appellant would visit his mother often.  []Appellant moved out Thursday, December 11.  Frederick Harris, Jr. went to Olivia Gilbert and Lamar Gilbert's home with Angela Harris on December 13.  He testified that he later told the police that Angela Harris was worried about her mother and … Appellant's car was in the driveway.

Dwayne Yenchik, a police officer, testified that he, Officer [Michael] Lape, and Officer Broadway responded to the call for a welfare check at 223 Suncrest Drive on December 1[6].  He was not present when Angela Harris kicked in the door, but he had been told by Officer Lape that that was what happened.  He testified that he entered the home and found a fully-dressed, black male, identified as … Appellant, on the bed, underneath the blankets, in the master bedroom.  []Appellant did not respond to attempted rousing, so they requested an ambulance and looked for identification in his pockets.  He testified that he found … Appellant's identification, a credit or debit card, and a note in … Appellant's pockets.  The officers then proceeded to look for Mr. and Mrs. Gilbert, but did not see them or any indication that they had gone on vacation.

[Officer] Lape, … testified that he responded to a call for a welfare check at 223 Suncrest on December 1[6].  The officers did not see

any broken windows or unlocked doors; no one answered the door, and they told Angela Harris that if she entered the home, she could be charged with a crime. He stated that they methodically looked for Mr. and Mrs. Gilbert, searching the entire first floor. When they found no sign of the Gilberts on the first floor, they proceeded to the basement and the garage. He testified that there were several garbage cans in the garage, and a short time later, the officers opened the first garbage can, which contained a rolled-up piece of carpet. The second garbage can contained what the officers believed to be a human head. At that point, he testified that the officers stopped what they were doing and contacted their superiors and the Allegheny County Police.

Patrick Kinavey, a detective with the Allegheny County Police Department's Homicide Unit, responded to a call from the Penn Hills municipality police for assistance with a homicide investigation. The Mobile Crime Unit was contacted to process the crime scene. Once the detective was briefed by the officers who initially responded, [Detective] Kinavey decided that it was necessary to get a search warrant, so he proceeded to obtain one. He determined that … Appellant owned the car that was sitting in the driveway. The Commonwealth, using photos, asked [Detective] Kinavey to describe what they found once inside the home. [Detective] Kinavey stated that they found a partially constructed Christmas tree, a receipt from Home Depot for a 45-gallon, wheeled trashcan purchased on December 16, a receipt for money withdrawn from a MAC machine, a MAC card issued to Olivia Gilbert, bleach bottles in the basement, a red-brown stain on the blue carpet in the basement, a block set of knives with no knives in it[,] a receipt from Home Depot for 3 45-gallon trashcans purchased [on] December 15, and several new, large trashcans in the garage, some open and some closed. The officers marked the trashcans [with numbers for] identification [purposes].

[Detective] Kinavey testified that in the trashcans, there was a portion of blue carpet with heavy red-brown stains, a taped-shut trash bag with a human head inside, other body parts, and knives from the empty block in the kitchen. The trashcans were removed to the medical examiner's office. In the basement, there was a portion of carpet missing; a portion of the wall missing; red-brown staining on an iron board, the carpet, and the furnace; and what the officers suspected was human tissue. In the Gilberts' car, the officers found a receipt from Lowe's for a 14-piece knife set, purchased on December 16. Can 2 contained a portion of a human torso, with several stab wounds. Can 3 contained the lower

- 3 -

portion of a female from the waist down, cut at the knees. Can 4 contained the lower portion of a male, the genital area and the thigh, cut at the knees. Can 5 contained bloody clothing and human heads. Can 6 contained the portion of the blue carpet and 5 knives, which had bent or broken handles. Can 7 contained rugs, clothing, and other body parts. He also testified that … Appellant was wearing a white t-shirt and tan khaki pants, which had blood stains on them.

Pamela Woods, a trace evidence examiner for the Allegheny County Medical Examiner's Office, testified as an expert that the carpet in the garage matched the carpet in the basement. Emily Wilkinson, a scientist in the Medical Examiner's Forensic Laboratory Division, testified as an expert, that she performed luminal testing in the basement of the home. She testified that there were wiping patterns, splatter patterns, and drip patterns. Anthony Perry, a police officer, testified that he was assigned to determine who picked up the trash at 223 Suncrest Drive. He testified that he went to the landfill and searched for … body parts but was unable to locate them.

Kevin L. McCue, a detective, testified that he interviewed … Appellant's father, Frederick Harris, Jr., who told him that he told his son to move out of their home, figuring that he was probably going to stay at a shelter. Venerando Costa, a detective, testified that he went to Lowe's and Home Depot and obtained evidence related to the receipts found in the Gilberts' home. Mike Feeney, a detective, testified that he collected video evidence from various businesses that show[ed] the movements of the victims and … Appellant. Daniel McGregor Mayer, a detective, testified to two wounds observed on … Appellant's hands.

Elizabeth Wisbon, a scientist for the Allegheny County Medical Examiner's Office, testified as an expert about the testing of blood evidence in the case. Stephanie Nickolas, a scientist with the Allegheny County Medical Examiner's Office, testified as an expert on latent fingerprint examination. She testified that she was able to develop latent fingerprints on one of the trash bags, the items within the new knife box, plastic sleeves that came out of a trash bag, and the roll of packing tape. Jason Clark, a scientist for the Allegheny County Medical Examiner's Office, testified as a latent fingerprint expert that he processed the remaining items that Wisbon did not test for latent fingerprints. He testified that he found … Appellant's fingerprints of value, meaning they were sufficient enough to be connected with someone, on 3 of the knots

- 4 -

of the trash bags. Ashley Platt, a scientist for the Allegheny County Medical Examiner's Office, testified as an expert on forensic biology and DNA analysis about DNA swabbing from inside the trash bags. []Appellant's DNA did not match the samples that were taken, except for possible bloodstaining on the pocket of a pair of pants and a t-shirt. There was some testimony that there may have been a third DNA sample in a mixed sample, but … Appellant's DNA did not match it. She also testified to the general ability of cleaners and bleach to degrade DNA samples.

Abdulrezak Shakir, a forensic pathologist for the Allegheny County Medical Examiner's Office, testified as an expert about what body parts were found in each trashcan. He testified about the wounds on the body parts of Lamar and Olivia Gilbert, opining that Lamar Gilbert died from stab wounds of the trunk and dismemberment took place after death. The manner of death was homicide. In his opinion, Olivia Gilbert died as a result of sharp force trauma with dismemberment taking place after death; the manner of death was homicide.

Trial Court Opinion (TCO), 3/14/18, at 4-9 (footnote and citations to the trial transcripts omitted).

The Commonwealth charged Appellant with two counts of first-degree murder, 18 Pa.C.S. § 2502(a);[1] and two counts of abuse of a corpse, 18 Pa.C.S. § 5510. Appellant filed a timely motion to suppress, and the trial court conducted a suppression hearing on May 23, 2016. On July 27, 2016, the court denied Appellant's suppression motion. A jury trial followed on September 20-27, 2016. On the final day of trial, the jury found Appellant guilty on all counts. On January 3, 2017, the court sentenced Appellant to life imprisonment without the possibility of parole for each count of first-degree

---

[1] In the criminal information, the Commonwealth charged Appellant generally with homicide, 18 Pa.C.S. § 2501, but also indicated that it was specifically seeking a conviction for first-degree murder.

murder, and to 1-2 years' incarceration for each count of abuse of a corpse. The court ordered all sentences to run consecutively.

Appellant filed a timely post-sentence motion, which was denied immediately following a hearing held on February 14, 2017. Appellant then filed a timely notice of appeal and a timely, court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued its Rule 1925(a) opinion on March 14, 2018. Appellant now presents the following questions for our review:

> Did the court below err when it permitted the Commonwealth to introduce, over defense objection, 10 photographs of the decedents' dismembered remains?

> Did the court below err when it denied Appellant's pretrial motion to suppress physical evidence, including but not limited to the body parts found in the garbage cans located in the garage of the residence that the police entered?

Appellant's Brief at 4.

Appellant's first issue concerns the court's admission of ten "gruesome photographs depicting the severed heads and body parts of the two victims in this case." *Id.* at 13. Appellant contends that the Commonwealth could have "establish[ed] what it need[ed] to establish in an alternative way" and, as such, the probative value of the photos was outweighed by their prejudicial effect on the jury. *Id.* Appellant also argues that the prejudice that resulted was not alleviated by the court's issuance of a curative instruction. *Id.*

We are constrained to deem this issue waived, as the at-issue photographs are not contained in the certified record.[2]

> It is well-settled … that "this Court may consider only the facts that have been duly certified in the record when deciding an appeal." ***PHH Mortgage Corp. v. Powell***, 100 A.3d 611, 614 (Pa. Super. 2014), citing Pa.R.A.P. 1921 Note. Moreover, "it is [the a]ppellant's responsibility to ensure that this Court has the complete record necessary to properly review a claim." ***Commonwealth v. Tucker***, 143 A.3d 955, 963 (Pa. Super. 2016) (internal quotation marks and citation omitted).

***Commonwealth v. Kennedy***, 151 A.3d 1117, 1127 (Pa. Super. 2016) (holding that the appellant waived his challenge to the trial court's admission of crime scene photographs where the photographs were not contained in the certified record on appeal). It is simply impossible for this Court to assess the inflammatory nature of photographs without the ability to view them.

Next, Appellant argues that the trial court erred when it denied his pre-trial motion to suppress the physical evidence seized from 223 Suncrest Drive. Specifically, Appellant sought to suppress evidence of the victims' body parts discovered in the garbage cans, as the search discovering that evidence was initiated without a warrant, in the absence of an exception to the warrant requirement, and while Appellant was present in that home. The trial court held that Appellant did not reside in the home where the evidence was found

---

[2] We note that this Court made numerous attempts to bring the omission of the photographs from the certified record to Appellant's counsel's attention. Despite these efforts, Appellant did not make any attempt to seek this Court's assistance with obtaining the photographs from the Commonwealth and/or the trial court, nor did Appellant make any attempt to advise this Court of any progress made or not made in obtaining that evidence for our review.

and, thus, lacked standing to challenge the search, and/or a reasonable expectation of privacy in that home. TCO at 13-14. Alternatively, the trial court held that the search was justified under the community caretaking doctrine, an exception to the warrant requirement. *Id.* at 14-15.

> Our standard of review in addressing a challenge to a trial court's denial of a motion to suppress is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the prosecution prevailed in the suppression court, we may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn from them are in error.

*Commonwealth v. Bell*, 871 A.2d 267, 271 (Pa. Super. 2005) (cleaned up).

> The law of search and seizure remains focused on the delicate balance of protecting the right of citizens to be free from unreasonable searches and seizures and protecting the safety of our citizens and police officers by allowing police to make limited intrusions on citizens while investigating crime. It is well established that probable cause alone will not support a warrantless search or arrest in a residence unless some exception to the warrant requirement is also present. Absent consent or exigent circumstances, private homes may not be constitutionally entered to conduct a search or to effectuate an arrest without a warrant, even where probable cause exists.

*Commonwealth v. Johnson*, 68 A.3d 930, 935 (Pa. Super. 2013) (cleaned up). However, even assuming a defendant has standing to challenge a search on Fourth Amendment grounds in a suppression motion,[3] "[i]n order to

---

[3] Standing requires "a proprietary or possessory interest in the premises searched[.]" *Commonwealth v. Torres*, 764 A.2d 532, 542 (Pa. 2001).

actually prevail on such a motion, the defendant must also separately demonstrate that he had a subjective expectation of privacy in the premises at the time of the search and that such an expectation is objectively reasonable, *i.e.*, that he had a legitimate expectation of privacy." ***Torres***, 764 A.2d at 542.

Here, the trial court found that:

Appellant did not live in the home with the victims. []Appellant's father, with whom he had been living for over a year, testified that he was told by … Appellant that he was going to get his own place. An officer testified that … Appellant's father said he believed … Appellant was going to stay at a shelter. []Appellant's sister testified that the victim, Olivia Gilbert, had told her that she would not allow … Appellant to move into her home. []Appellant's driver's license listed 223 Suncrest Drive as his residence, but for at least one year prior to the murders, … Appellant was living with his father. The evidence of his license indicates that … Appellant does not update his residence on his license. The evidence supports that … Appellant did not live in the home….

TCO at 13-14 (citations omitted).

Appellant contends, however, that he did have a privacy interest in the premises at 223 Suncrest Drive:

Appellant was the only person of record who possessed a privacy interest in the residence, judging by his valid license … listing 2[2]3 Suncrest Drive as being his residence. Additionally, he was inside the residence, and had not entered it by force; as both the responding police officers and Angela Harris reported, the house was secure and had no signs of forced entry. Moreover, Appellant was inside the residence in a locked bedroom. This evidence presented at the suppression hearing suggests that Appellant was either let into the house by its occupants or else gained entry through appropriate methods (such as the garage code or doors). Appellant's father, it will be recall[ed], testified that Appellant often visited his mother and had a very close relationship with his mother. Appellant's father also noted that Appellant would spend

… nights away and that he could have been staying with his mother at the Suncrest Drive address. The fact that Appellant was found in the secured home is evidence that he was permitted entry or gained lawful entry to the home. As such, these factors establish an expectation of privacy in the 223 Suncrest Drive address. Appellant was, at a minimum, an overnight guest, in the home of his mother and therefore, has a recognized expectation of privacy[.]

Appellant's Brief at 36-37.

We agree with the trial court. First, Appellant places undue emphasis on the address listed on his license. It was undisputed that Appellant had not resided at the residence for more than a year, as he had been living with his father. Thus, it was reasonable for the trial court to assign little weight to the license address when assessing whether Appellant had a reasonable expectation of privacy at 223 Suncrest Drive.

Second, while Appellant's counsel speculates as to how Appellant likely gained entry into the home, it is merely that: speculation. It is also possible that Appellant entered through an unlocked door without permission to do so. It is possible that he followed either victim into the home immediately before murdering them. It is possible that the victims permitted him entry, but then he murdered the victims when he [was] instructed to leave. Thus, there are multiple scenarios consistent with the lack of signs of forced entry that are also inconsistent, rather than consistent, with a reasonable expectation of privacy in the residence. Unfortunately, the best possible evidence of

Appellant's objective expectation of privacy in the home—the testimony of the victims who owned it and resided therein—is not available.[4]

Third, the trial court clearly placed greater weight on the testimony of Appellant's sister, who stated that Appellant was not permitted to reside at 223 Suncrest Drive. The trial court was free to believe this testimony, and to assess lesser weight to contradictory evidence. Indeed, "it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony. The suppression court is also entitled to believe all, part or none of the evidence presented." **Commonwealth v. Galendez**, 27 A.3d 1042, 1046 (Pa. Super. 2011) (cleaned up).

Finally, it was Appellant's burden at the hearing to establish a reasonable expectation of privacy at 223 Suncrest Drive. **See Commonwealth v. Millner**, 888 A.2d 680, 686 (Pa. 2005) (recognizing that a "suppression defendant" has an "obligation to demonstrate that the challenged police conduct implicated a reasonable expectation of privacy that he personally possessed"). Appellant's presence in the home and, indeed, even his possession of a license bearing that address, speak only to his "subjective expectation of privacy in the premises at the time of the search…."

_____

[4] According to Appellant's father's testimony, Appellant had moved out of his father's home (where he had been living for more than a year) a few days prior to the search. N.T. Suppression, 5/23/16, at 5-6. Appellant told his father that he had found an apartment. **Id.** at 6. Thus, immediately prior to the search at issue, Appellant did not claim to be living with his mother at 223 Suncrest Drive.

*Torres*, 764 A.2d at 542. Here, Appellant may well have demonstrated a subjective expectation of privacy, but he failed to demonstrate that the expectation was "objectively reasonable" in the circumstances of this case. *Id.*

In this regard, we find convincing the Commonwealth's comparison of this case to that of *Commonwealth v. Cameron*, 561 A.2d 783 (Pa. Super. 1989). In *Cameron*, the police entered an ostensibly abandoned house without a warrant and discovered the defendant in possession of narcotics therein. The defendant sought suppression of the seized contraband and, "[t]he suppression court granted the motion to suppress, holding that the presence of food, a couch, and a television set in the room indicated that the house had some of the attributes of a dwelling place, and therefore Cameron had a reasonable expectation of privacy there." *Id.* at 784. This Court ultimately reversed that decision.

The *Cameron* Court first acknowledged that the defendant had "manifested a subjective expectation of privacy" in the dwelling. *Id.* at 785. Nevertheless, the Court stated that it could not "be said that his expectation of privacy is one that society is prepared to accept as reasonable." *Id.* The Court went on to reason:

> Although the property interest involved need not amount to an ownership interest, there must be some legal or *de facto* right to control the area in question. Considering the record in the instant case, there is no evidence to indicate that Cameron had any legal or *de facto* right to control the house. The testimony of [the police officer] indicated that the house was abandoned, and, although there was some evidence to show that Cameron was "squatting"

- 12 -

there, the record contains no facts which would lead us to believe that he had any rights as against the owner, or as against any other person who attempted to enter the house. He therefore could not expect to exclude any other person who attempted to enter.

*Id.* at 786.

Similarly, here, Appellant's presence in the home, the address on his license, and, perhaps, even his relationship to one of the home's owners, adequately demonstrated his subjective expectation of privacy at 223 Suncrest Drive. However, there was no evidence presented to demonstrate any "legal or *de facto* right to control the house." *Id.* Indeed, in **Cameron**, the defendant was squatting in an abandoned house, whereas here, Appellant was found in the Gilberts' home. In that sense, Cameron was in a better position to claim an objectively reasonable privacy interest, given that there was no objectively superior competing interest in the abandoned dwelling. Here, however, it is undisputed that Appellant was discovered in the Gilberts' home, and no credible evidence was proffered by Appellant to demonstrate that the Gilberts had granted him legal or *de facto* control of the house. To the contrary, the trial court received testimony that it found credible that Appellant's mother had declined to grant Appellant such control. Accordingly, we conclude that the trial court did not err in finding that Appellant lacked an objectively reasonable expectation of privacy interest in the home.

Appellant argues, however, that even if he did not possess a reasonable expectation of privacy in the residence, he "at the very least" possessed a reasonable expectation of privacy "in the interior of the 45-gallon

plastic garbage cans…." Appellant's Brief at 40. Appellant did not raise this issue in his Rule 1925(b) statement and, consequently, the trial court did not address it specifically in its Rule 1925(a) opinion. Accordingly, we conclude that is waived. *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) ("Any issues not raised in a 1925(b) statement will be deemed waived.").

In any event, had Appellant not waived this claim, we would conclude that he would not be entitled to relief on that basis. To support his contention that he possessed a distinct and objective expectation of privacy in the garbage cans, Appellant cites *Arizona v. Hicks*, 480 U.S. 321 (1987). In *Hicks*,

> a bullet was fired through the floor of [Hicks]'s apartment, striking and injuring a man in the apartment below. Police officers arrived and entered [Hicks]'s apartment to search for the shooter, for other victims, and for weapons. They found and seized three weapons, including a sawed-off rifle, and in the course of their search also discovered a stocking-cap mask.
>
> One of the policemen, Officer Nelson, noticed two sets of expensive stereo components, which seemed out of place in the squalid and otherwise ill-appointed four-room apartment. Suspecting that they were stolen, he read and recorded their serial numbers—moving some of the components, including a Bang and Olufsen turntable, in order to do so—which he then reported by phone to his headquarters. On being advised that the turntable had been taken in an armed robbery, he seized it immediately. It was later determined that some of the other serial numbers matched those on other stereo equipment taken in the same armed robbery, and a warrant was obtained and executed to seize that equipment as well. [Hicks] was subsequently indicted for the robbery.

*Id.* at 323–24.

The trial court granted Hicks's motion to suppress, reasoning that although the warrantless search of Hicks's apartment was justified based on exigent circumstances related to the shooting, Officer Nelson's action of moving the stereo components to view their serial numbers constituted a search unrelated to the exigency. *Id.* at 324. The Court of Appeals of Arizona affirmed, and the state appealed that decision to the Supreme Court of the United States, which also affirmed. In doing so, the Supreme Court reasoned that Nelson did not discover the serial numbers in plain view during an otherwise lawful search. Rather, a search requiring a separate showing of probable cause occurred that was independent from the initial justification for entering and searching Hicks's apartment.[5] *Id.* at 326-27.

However, Hicks, unlike Appellant here, had a reasonable expectation of privacy in his apartment. The warrantless breach of Hicks's privacy right was justified only due to the exigency created by the shooting and, therefore, that breach was limited to the scope of the exigency. Here, however, Appellant had no reasonable expectation of privacy in the home searched at all, including any containers found therein. This is not a search that constitutes an exception to the warrant requirement; rather, this was a situation where Appellant lacked a privacy right upon which to assert a suppression claim

---

[5] The Court acknowledged that "[i]t would be absurd to say that an object could lawfully be seized and taken from the premises, but could not be moved for closer examination." *Id.* at 326. However, the police lacked probable cause that the item was stolen until the serial numbers were revealed, and nothing about the shooting itself suggested the illegality of the stereo parts.

against the government at all. Thus, **Hicks** is inapplicable to the circumstances of this case and, even had Appellant not waived this aspect of his suppression claim, we would deem it meritless.

Judgment of sentence **affirmed**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2019